SEDGWICK, DETERT, MORAN & ARNOLD LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
(212) 422-0202
Facsimile (212) 422-0925
Attorneys for Defendant
AP&M Field Services, Inc.

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

| | |
|---|---|
| In re | Chapter 11 |
| CALPINE CORPORATION, et al., | |
| Debtors. | Case No. 05-60200 (BRL)<br>(Jointly Administered) |

-----------------------------------------------------------------X

| | |
|---|---|
| CALPINE EASTERN CORPORATION, | Adversary Case No.<br>07-03033 (BRL) |
| Plaintiff, | |
| -v- | **NOTICE OF MOTION** |
| AP&M FIELD SERVICES, INC., | |
| Defendant. | |

-----------------------------------------------------------------X

To:

Richard M. Cieri (RC 6062)
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Fax: (212) 446-4900

**COUNSEL:**

 **PLEASE TAKE NOTICE** that Defendant AP&M FIELD SERVICES, INC., by its

attorneys, Sedgwick, Detert, Moran & Arnold LLP will move this Court on a date designated

- 1 -

by the Court at the United States Courthouse, Foley Square, City of New York, for an Order

Withdrawing the Reference pursuant to 28 U.S.C.A. § 157.

**PLEASE TAKE FURTHER NOTICE** that in support of this motion, defendant shall

rely on the Memorandum of Law and Affidavit of Scott L. Haworth, attached hereto.

**PLEASE TAKE FURTHER NOTICE** that defendant respectfully requests oral

argument.

DATED:     November 8, 2007

SEDGWICK, DETERT, MORAN & ARNOLD LLP
Attorneys for Defendant
AP&M Field Services Inc.

Scott L. Haworth (SH 5890)
Alan R. Levy (AL 0722)
125 Broad Street, 39th Floor
New York, New York 10004-2400
Telephone: (212) 422-0202
Facsimile: (212) 422-0925
Attorneys for Defendant
AP&M Field Services, Inc.

- 2 -

SEDGWICK, DETERT, MORAN & ARNOLD LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
(212) 422-0202
Facsimile (212) 422-0925
Attorneys for Defendant
AP&M Field Services, Inc.

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

In re                                                      Chapter 11

CALPINE CORPORATION, et al.,
                                                           Case No. 05-60200 (BRL)
                                  Debtors.                 (Jointly Administered)

-----------------------------------------------------------------X

                                                           Adversary Case No.
CALPINE EASTERN CORPORATION,                               07-03033 (BRL)

                                  Plaintiff,

          -v-                                              **AFFIDAVIT OF SCOTT L.
                                                           HAWORTH**

AP&M FIELD SERVICES, INC.,

                                  Defendant.

-----------------------------------------------------------------X

Scott L. Haworth, under penalty of perjury, affirms as follows:

　　　1.　　　I am an attorney at law, duly licensed to practice in the State of New York,

and a Partner in Sedgwick, Detert, Moran & Arnold, LLP, attorney for defendant AP&M

Field Services, Inc. ("AP&M"). I am fully familiar with all matters set forth herein.

　　　2.　　　I submit this affidavit and accompanying exhibits in support of defendant

AP&M's Motion to Withdraw the Reference.

NY/513411v1

3.      On October 15, 2007, Plaintiff filed this Adversary Proceeding against AP&M in the United States Bankruptcy Court for the Southern District of New York. (See Complaint attached hereto as Exhibit A.)

4.      Plaintiff's claims against AP&M arise under a Continuing Service Agreement ("Agreement") entered into by the Parties in October, 2005. The Agreement was effective October 1, 2005. (See Agreement attached hereto as Exhibit B.).

5.      Pursuant to the Agreement, AP&M contracted to perform services on a gas turbine ("turbine") located at a property operated by Calpine, as set forth in any Purchase Order thereafter entered into by the Parties. The turbine provides power to John F. Kennedy Airport and incremental power indirectly to Consolidated Edison Company of New York. (See Complaint at Exhibit A.).

6.      On March 6, 2006, AP&M installed various parts on the turbine according pursuant to a purchase order. Pursuant to Federal Regulations applicable to jet engines, at all times that AP&M performed work on the turbine, they were supervised by a Calpine representative. All work performed by AP&M was inspected by the Calpine representative, who subsequently signed off on the work.

7.      Plaintiff alleges that on March 6, 2007, AP&M failed to properly perform certain maintenance on the turbine. Plaintiff alleges that as a result, the turbine stalled and caused a temporary power outage.

8.      Plaintiff's complaint alleges claims for breach of contract, contractual indemnification, breach of warranty and negligence, gross negligence and recklessness. (See Complaint at Exhibit B.). All claims arise out of the contract entered into by the Parties **before** Plaintiff filed its bankruptcy petition.

- 2 -

NY/513411v1

9.     This motion is AP&M's first appearance in this matter.  AP&M has not filed a proof of claim, set-off claim, or any other claim against Plaintiff in either this matter or in Plaintiff's voluntary petition for relief under Title 11 of Bankruptcy Code.

10.     AP&M denies the allegations contained in Plaintiff's Complaint.

11.     AP&M intends to file a jury demand at the time it files its Answer or other responsive pleading to the Complaint.

12.     AP&M does not consent to the entry of a final judgment or order by the Bankruptcy court in this matter.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

DATED:     November 8, 2007

> SEDGWICK, DETERT, MORAN & ARNOLD LLP
> Attorneys for Defendant
> AP&M Field Services Inc.
>
> _____
> Scott L. Haworth (SH 5890)

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: Calpine Corporation

Bankruptcy Case No.: 05−60200−brl

Calpine Eastern Corporation

Plaintiff,

Adversary Proceeding No. 07−03033−brl

−against−
AP&M Field Services, Inc.

Defendant

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: | |
|---|---|
| | Clerk of the Court |
| | United States Bankruptcy Court |
| | Southern District of New York |
| | One Bowling Green |
| | New York, NY 10004−1408 |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: | |
|---|---|
| | Richard M. Cieri |
| | Citigroup Center |
| | 153 East 53rd Street |
| | New York, NY 10022 |

If you make a motion, your time to answer is governed by Bankruptcy Rule 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court Southern District of New York One Bowling Green New York, NY 10004−1408 | Room: Courtroom 623 (BRL), One Bowling Green, New York, NY 10004−1408 |
|---|---|
| | Date and Time: 11/27/07 10:00 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 10/17/07

Kathleen Farrell−Willoughby

*Clerk of the Court*

By: /s/ Tiffany Campbell

*Deputy Clerk*

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Matthew Solum (MS 1616)
Gregory T. Heyman (GH 4399) ,
Carl D. LeSueur (CL 0315)

KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200
Andrew R. McGaan, P.C. (AM 7598)
Barack S. Echols (admitted pro hac vice)

*Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| CALPINE CORPORATION, et al., | ) Case Number 05-60200 (BRL) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| CALPINE EASTERN | ) |
| CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Case No.: |
| | ) |
| | ) |
| AP&M FIELD SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiff Calpine Eastern Corporation ("Calpine Eastern" or the "Company"), as debtor-

in-possession, as and for its complaint seeking damages against Defendant AP&M Field

Services, Inc. ("AP&M") hereby alleges the following:

## NATURE OF ACTION

1.     This action arises out of AP&M's failure to properly maintain a Calpine Eastern[1]
gas turbine (the "Turbine"), which powers John F. Kennedy, Jr. Airport ("JFK Airport")
pursuant to an energy purchase agreement with the Port Authority of New York and New Jersey
("Port Authority").

2.     In October 2005, Calpine hired AP&M because, among other things, AP&M held
itself out as a provider of "superior services" that were "defect-free." AP&M also represented
that its goal was to "consistently meet and exceed our customers' expectations and requirements"
and that it was a specialist in the very type of gas turbine that Calpine operates at JFK Airport.
(*See* AP&M, "AP & M Mission Statement," available online at
<http://www.apm4parts.com/index.php?p=25> (last checked Aug. 29, 2007), attached hereto as
Exhibit A.)

3.     AP&M expressly agreed that its work would be (a) "free from defects in
workmanship," (b) "in accordance with the terms of this Agreement and the Purchase Order
applicable to such Services," and (c) "all with the degree of high professional skill normally
exercised or expected from recognized professional firms engaged in the practice of supplying
services of a nature similar to the Services in question." (*See* Continuing Services Agreement
("CSA"), attached hereto as Exhibit B).

4.     In accordance with the CSA, Calpine Eastern issued a purchase order on February
9, 2006 requesting that AP&M perform maintenance on the Turbine ("Purchase Order," attached
hereto as Exhibit C.)

---

[1]    Calpine Eastern Corporation is a wholly-owned subsidiary of Calpine Power Company, which, in turn, is
wholly owned by Calpine Corporation. All three entities are debtors in the jointly administered Chapter 11
cases pending in this Court entitled *In re Calpine Corporation, et al.*, Case No. 05-60200 (BRL).

1

5.    AP&M did the work, but it was far from defect-free.  In fact, AP&M failed to perform the most basic task:  applying proper torque to one of the Turbine's key nuts.

6.    The result was not surprising.  On June 3, 2006, the nut came loose, and caused extensive damage to the Turbine.  Worse still, the Turbine could no longer provide power to JFK Airport.

7.    And yet AP&M refused to repair the Turbine or provide a temporary replacement.  Because Calpine Eastern -- and JFK Airport -- needed the Turbine back on line as quickly as possible, Calpine Eastern hired GE Energy ("GE"), an affiliate of the manufacturer, to repair the Turbine.  The repairs cost more than $2 million.

8.    Calpine Eastern now seeks to recover, for the benefit of Calpine Eastern's estate and its creditors, its losses, including, but not limited to, the cost to repair the Turbine and business interruption expenses, caused by AP&M.

## JURISDICTION AND VENUE

9.    This adversary proceeding arises under the terms of the CSA and in the chapter 11 cases pending in this Court entitled *In re Calpine Corporation, et al.*, Case No. 05-60200 (BRL) (Jointly Administered) (the "Chapter 11 Cases").  This proceeding is a "core proceeding" under 28 U.S.C. § 157(b)(1)(2)(A).  This Court has subject matter jurisdiction over it pursuant to 28 U.S.C. §§ 157 and 1334.  Moreover, this Court has jurisdiction in this matter by consent of the parties as provided in paragraph 17 of the CSA.  Paragraph 17 provides in pertinent part: "Each party irrevocably agrees that any legal action or proceeding with respect to the CSA and, if applicable, any Purchase Orders, shall be brought in the federal or state Courts of the State of New York." (Exhibit B at § 17 at 9.)  Original jurisdiction over bankruptcy matters is vested in the United States District Courts pursuant to section 1334 of Title 27 of the United States Code.  Each District Court may refer all matters directly and indirectly involving a case under the

Bankruptcy Code to the District Court's Bankruptcy Judges. 28 U.S.C. § 157(a). Nearly every District Court has provided by rule or order for automatic reference of all bankruptcy-related matters to the Bankruptcy Court, including the Southern District of New York pursuant to Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984. The Bankruptcy Court is a unit of the District Court. *See In re Kaliana*, 207 B.R. 597, 603 (Bankr. N.D. Ill. 1997).

10.    This Court is a proper venue for this action under 28 U.S.C. §§ 1408 and 1409(a), because the Chapter 11 Cases are pending in this Court and pursuant to 28 U.S.C. § 1391 because a substantial part of AP&M's breaches occurred in New York. Further, paragraph 17 of the CSA provides that each party "irrevocably waives any and all objections" which it may have as to venue in any federal or state Court of the State of New York. (Exhibit B at § 17 at 9.)

## THE PARTIES

11.    Calpine Eastern, a Delaware corporation, is involved in the ownership, operation, development, and construction of power generation facilities and the sale of electricity and its by-product, thermal energy, primarily in the form of steam. Calpine Eastern is a debtor-in-possession in the Chapter 11 Cases.

12.    AP&M, a Florida corporation, is a company offering parts and services related to aero-derivative gas turbines.

## ALLEGATIONS

### The Debtors and their Bankruptcy Filings.

13.    On December 20, 2005 ("the Petition Date"), Calpine Eastern's parent company, Calpine Corporation, and certain of its subsidiaries, including Calpine Eastern, filed in this Court

3

voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. §§ 101-1632 (as amended from time to time, the "Bankruptcy Code").

14.    Calpine Eastern continues to manage and operate its businesses as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**Calpine Eastern Operates the Turbine at JFK Airport.**

15.    The Turbine is one of two turbines that Calpine Eastern operates in Jamaica, New York in order to provide power to JFK Airport. It also provides incremental power indirectly to Consolidated Edison Company of New York ("ConEd") through the New York Independent System Operator. In 2003, Calpine Eastern purchased the Turbine, which is a LM6000PC turbine, from a GE affiliate.

16.    The Turbine is a dual-rotor, direct drive gas engine comprised of many rapidly moving parts. The Turbine includes a High Pressure Compressor with five stages of stator vanes, which direct the airflow. Each stator vane has a lever arm that is held in place by a nut. The Turbine's High Pressure Compressor also has fourteen stages of blades. The rotating blades accelerate airflow into the annular combustor, where the airflow mixes with fuel for ignition.

17.    The resulting combustion process leads to the generation of approximately 100 megawatts of power from the two turbines for JFK Airport and ConEd.

18.    Because its parts move at high speed, any loose part breaking free or any small particle passing through the High Pressure Compressor can cause severe damage to the Turbine. Thus, it is essential that the parts be firmly affixed and that the nuts be precisely torqued so that the Turbine can operate properly and provide power to Calpine Eastern's customers.

19.    On September 16, 2004, the manufacturer of the Turbine issued a service bulletin (the "GE Service Bulletin") to owners of LM6000 turbines instructing the owners to perform

specific maintenance on the Turbine as it approaches 12,500 hours in operation to maximize the Turbine's operating life.

20.     Thereafter, Calpine Eastern began looking for a company to perform this maintenance.

**AP&M Held Itself Out as an Expert in LM6000 Turbines.**

21.     Due to the Turbine's complexity, and because of the importance of the customers depending on the operation of the Turbine, Calpine Eastern engaged in a careful selection process.

22.     AP&M represented itself as providing superior service:

> At AP&M, our mission is to provide superior products and services to our customers at a competitive price, on time and defect-free. Through continual growth and improvement in our products, services and quality processes, we consistently meet and exceed our customers' expectations and requirements.

(Exhibit A.)

23.     AP&M also holds itself out as a specialist in the LM6000 turbine -- the very same type of turbine that Calpine Eastern operates at JFK Airport:

> AP&M Field Services, Inc. (AP&M Field Services) is a wholly owned subsidiary of AP&M. *AP&M Field Services specializes in inspections, field services, and other related activities for GE LM2500, LM2500 Plus, LM5000, and LM6000 engines.*

(AP&M,     "Field     Services,"     available     online     at <http://www.apm4parts.com/index.php?p=10> (last checked Aug. 29, 2007) (Emphasis added), attached hereto as Exhibit D.)

24.     Relying on AP&M's represented expertise, Calpine Eastern engaged AP&M to perform maintenance on the Turbine.

**Calpine Eastern Agrees to Perform Defect Free Work.**

25.    Calpine Eastern and AP&M entered into an agreement for the repairs on or about October 18, 2005.

26.    Pursuant to Section 5 of that agreement, AP&M warrants, among other things, that its services will be free from defects:

> All Services . . . shall be *free from defects in workmanship*, and that [AP&M] shall perform all Services in accordance with all applicable engineering, construction and other codes and standards, in accordance with prudent electrical utility standards, and in accordance with the terms of this Agreement and the Purchase Order applicable to such Services, all *with the degree of high professional skill normally exercised or expected from recognized professional firms engaged in the practice of supplying services of a nature similar to the Services in question.*

(Exhibit B § 5 at 2.) (Emphasis added).

27.    The CSA further provides that AP&M will indemnify Calpine Eastern for all costs and expenses associated with this action.  Section 13.1 provides that:

> *[AP&M] agrees to protect, defend, indemnify, and hold harmless Calpine . . . from and against any and all liabilities, losses, damages, claims, liens, demands, and causes of action of every type . . . , and all costs and expenses associated therewith (including without limitation judgments, penalties, interest, settlement fees, court costs and legal fees)* incurred by the indemnities . . . which arise out of [AP&M's] negligence or wilfull misconduct.

(Exhibit B § 13.1 at 7.)  (Emphasis added).

**Calpine Eastern Requests that AP&M Perform Maintenance on the Turbine.**

28.    Following execution of the CSA, Calpine Eastern issued the Purchase Order and requested that AP&M perform the maintenance set forth in the GE Service Bulletin.

29.    The GE Service Bulletin incorporates by reference the Operation and Maintenance Manual for the LM6000 (the "Maintenance Manual").  The Maintenance Manual

has express instructions for securing the nuts of the stator vanes, including the precise torque for each nut and warning that the nuts be safety-wired.

30.    Finally, the LM 6000 Maintenance Manual also expressly cautions that failure to properly follow its procedures may cause the nut to come loose due to the vibrations of the machine.

31.    In or about March 2006, AP&M performed work on the Turbine. However, AP&M failed to properly secure a nut corresponding to a Stage 5 variable stator vane.

32.    AP&M's failure to secure the nut was contrary to the express instructions in the GE Service Bulletin and the Maintenance Manual, and directly contravened of its representations and warranties set forth in the CSA.

**The Turbine Is Severely Damaged.**

33.    AP&M's failure to properly secure the nut caused the nut to loosen as the Turbine stages rotated at super-high speeds. But for AP&M's failure to properly secure the nut, the nut would not have come loose.

34.    This was precisely the consequence of failure to properly secure the nut that was forewarned by the Maintenance Manual

35.    On June 3, 2006, the nut came free, causing the corresponding stator vane lever arm to dislodge. The unattached nut and lever arm unleashed a chain reaction in the High Pressure Compressor. Initially, they caused the stator vane (interior to the engine in the High Pressure Compressor) to shift to an improper position, which reversed the airflow in the engine.

36.    The stator vane then broke off and struck multiple parts of the engine's High Pressure Compressor. Blades throughout the High Pressure Compressor were damaged, and at least two blades completely broke off. Metal debris traveled through the High Pressure

7

Compressor and into the combustor, causing extensive damage to the Turbine. At approximately 7 p.m. on June 3, 2006, the Turbine came to a sudden halt.

**AP&M Cannot Repair the Damage it Caused.**

37.     Calpine Eastern immediately notified AP&M of the engine stall and that Calpine Eastern believed the engine stall was caused by AP&M's negligent maintenance.

38.     On June 8, 2006, two representatives of AP&M arrived to inspect the Turbine. AP&M's representatives were shown pictures of the lever arm and nut that were found on the package floor and inspected the lever arm and nut as well.

39.     Shortly thereafter, AP&M disclosed that it did not have the necessary parts or means to repair the Turbine. AP&M also informed Calpine Eastern that AP&M could not provide a replacement turbine while the Turbine was being repaired.

**Calpine Eastern Incurs Significant Expense to Repair the Turbine.**

40.     After it became clear that AP&M could not repair the Turbine, Calpine Eastern made arrangements for the manufacturer, GE, to repair the Turbine. It cost more than $2 million for GE to repair the Turbine.

41.     Calpine Eastern also incurred substantial costs associated with leasing a replacement turbine from GE. Additionally, Calpine Eastern suffered losses resulting from significant business interruption and loss of good will with its customers.

**AP&M Files Action Against Calpine Eastern.**

42.     In a June 30, 2006 letter, Calpine Eastern explained to AP&M that the damage to the Turbine was a result of AP&M's work, which was "deficient [and] failed to conform to industry standards and with the requirements of the CSA." (*See* Letter from Michael Urio, Plant Manager, Calpine - JFK Energy Center, to Robert Enslein, AP&M, dated June 30, 2006, attached hereto as Exhibit E.)

8

43.     AP&M failed to respond to the June 30, 2006 letter until almost three months later. AP&M never denied it was responsible for the damage to the Turbine.

44.     On September 21, 2006, AP&M responded and requested to inspect the Turbine and demanded that Calpine Eastern provide AP&M certain documents related to the repairs performed by GE. AP&M additionally demanded that Calpine Eastern "take all steps necessary to ensure that no portion of the turbine is altered or changed until this matter is concluded." (*See* Letter from Melissa Pena, Sedgwick Detert Moran & Arnold, LLP, Counsel to AP&M to Michael Urio, Plant Manager, Calpine - JFK Energy Center, dated Sept. 21, 2006, attached hereto as Exhibit F.)

45.     AP&M's demands were untimely and nonsensical.

46.     AP&M had already inspected the Turbine days after it had stalled and months prior to this letter, and the Turbine had already been repaired.

47.     Nonetheless, Calpine Eastern worked to respond to AP&M's requests, including providing dates for an additional inspection. Instead, AP&M filed a lawsuit seeking a court-ordered inspection. (*See* AP&M Complaint Against Calpine Eastern, attached hereto as Exhibit G.) Even after the lawsuit, Calpine continued to provide AP&M with information and continued to offer dates for AP&M to inspect the Turbine, but AP&M declined those offers.

48.     In total, as a result of AP&M's negligent work, breach of the CSA, and legal action, Calpine Eastern incurred damages and costs in excess of $2 million.

## COUNT I
### (Breach of Contract)

49.     Calpine Eastern hereby incorporates all of the above paragraphs as if fully set forth here.

50.     Calpine Eastern and AP&M are parties to a valid and binding contract.

51.     AP&M breached that contract by performing work without complying with industry standards and without "the degree of high professional skill normally exercised or expected from recognized professional firms" in the industry.

52.     Until the time of AP&M's breaches, Calpine Eastern duly performed its obligations under the CSA.

53.     As a result of AP&M's breaches, the Turbine was extensively damaged.

54.     · As a result of AP&M's breaches, Calpine Eastern incurred damages and costs well in excess of $2 million.

## COUNT II
### (Indemnification Against Losses)

55.     Calpine Eastern hereby incorporates all of the above paragraphs as if fully set forth here.

56.     Pursuant to Section 13 of the CSA, AP&M agreed to indemnify Calpine Eastern for any losses arising out of AP&M's negligence or willful misconduct.

57.     AP&M was negligent in performing the work in the Purchase Order.

58.     In its June 30, 2006 letter, Calpine Eastern notified AP&M that its actions had caused extensive damage to the Turbine, which resulted in substantial monetary losses. To date, AP&M has failed to indemnify Calpine Eastern.

59.     AP&M's failure constitutes a breach of the CSA by causing Calpine Eastern damages well in excess of $2 million, plus the fees, costs and expenses associated with this action.

## COUNT III
### (Breach of Warranty)

60.     Calpine Eastern hereby incorporates all of the above paragraphs as if fully set forth here.

10 .

61.     Pursuant to Section 5 of the CSA, AP&M explicitly warranted that its services would be "free from defects in workmanship."

62.     AP&M also holds itself out to the general public as a specialist in the LM6000 turbine -- the very same type of turbine that Calpine operates at JFK Airport.

63.     Breaching both express and implied warranties, in or about March 2006, AP&M failed to perform its services "free from defects" and with "the degree of high professional skill normally exercised or expected from recognized professional firms" in the industry.

64.     As a result of AP&M's breaches, the Turbine was extensively damaged.

65.     As a result of AP&M's breaches, Calpine Eastern incurred damages and costs well in excess of $2 million.

**COUNT IV**
(Negligence, Gross Negligence and Recklessness)

66.     Calpine Eastern hereby incorporates all of the above paragraphs as if fully set forth here.

67.     Pursuant to Section 5 of the CSA, AP&M explicitly agreed to render professional services to Calpine Eastern "with the degree of high professional skill normally exercised or expected from recognized professional firms" in the industry.

68.     In or about March 2006, AP&M was negligent, grossly negligent and reckless in performing the maintenance requested by Calpine Eastern as it relates to the work requested in the purchase order.

69.     Solely as a result of AP&M's negligence, gross negligence and recklessness Calpine Eastern incurred damages and costs well in excess of $2 million.

## PRAYER FOR RELIEF

**WHEREFORE**, Calpine Eastern prays the Court for a judgment:

1. ordering AP&M to pay Calpine Eastern well in excess of $2 million;

2. ordering AP&M to pay Calpine Eastern all of its attorneys' fees and costs associated with this action and the prior legal action instituted by Defendant;

3. ordering AP&M to pay Calpine Eastern for punitive and exemplary damages;

4. ordering AP&M to pay interest on all amounts; and

5. granting such other further relief as is just.

Date:   October 15, 2007

Respectfully submitted,

Richard M. Cieri (RC 6062)
Matthew Solum (MS 1616)
Gregory T. Heyman (GH 4399)
Carl D. LeSueur (CL 0315)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200
Andrew R. McGaan, P.C. (AM 7598)
Barack S. Echols (admitted pro hac vice)

*Counsel for Debtors and Debtors in Possession*

# Exhibit A

Aeroderivative gas turbines spare parts distributor and repair/field services for GE LM25...    Page 1 of 1

## ABOUT AP&M

| HOME | ABOUT | PRODUCTS & SERVICES | QUOTES, ORDERS & FORMS | CONTACT |

### ::: AP&M MISSION STATEMENT

At AP&M, our mission is to provide superior products and services to our customers at a competitive price, on time and defect-free. Through continual growth and improvement in our products, services and **quality processes,** we consistently meet and exceed our customers' expectations and requirements.

The success of any company comes from the quality of its employees, and we know we have some of the best. AP&M's highly trained personnel have extensive experience in the gas turbine industry, many coming to us from OEM distributors such as GE and Pratt & Whitney. Sales, warehouse, and field service employees are on call 24 hours per day, seven days per week, 365 days a year to ensure an immediate response to any emergency or unplanned event. Additionally, we continue to hire experienced, knowledgeable personnel to ensure that every customer's needs are met with the speed and quality that you have come to expect.

AP&M works hand in hand with each customer to meet the specific goals of your organization. We look forward to the opportunity to discuss your requirements and create a support plan to meet your needs. To explore any support possibilities with us, please call (561) 732-6000 or 1 (800) 998-9844.

### ::: REQUEST FOR QUOTE

AP&M prides itself on competitive pricing and superior service. Thank you for the opportunity to quote.

### ::: SEARCH THIS SITE





QUALITY MANAGEMENT &
CERTIFIED BY DNV
ISO 9001:2000

| CONTACT US | TERMS AND CONDITIONS | SITEMAP | DOWNLOADS | LOGIN |

# Exhibit B

CONTINUING SERVICES AGREEMENT

BETWEEN

Calpine Eastern Corporation

AND

AP & M Field Services, Inc.

## TABLE OF CONTENTS

Page

1. Purchase Orders .................................................................................................1
2. Term ......................................................................................................................1
3. Compensation .....................................................................................................2
4. Payment ...............................................................................................................2
5. Warranty .............................................................................................................2
6. Changes And Extra Services ...........................................................................3
7. Delays In Performance ......................................................................................4
8. Project Site ..........................................................................................................4
9. Termination ........................................................................................................4
10. Insurance ............................................................................................................5
11. Subcontracting ..................................................................................................6
12. Assignment And Delegation ...........................................................................7
13. Liability Indemnity ..........................................................................................7
14. Documents ..........................................................................................................8
15. Non-Disclosure Of Information .....................................................................8
16. Audits And Disputes .......................................................................................9
17. Governing Law ..................................................................................................9
18. Notices ...............................................................................................................10
19. Waiver ................................................................................................................10
20. Invalidity Of Provisions ...............................................................................10
21. Independent Contractor .................................................................................10
22. Laws, Regulations And Company Rules .....................................................11
23. Survival .............................................................................................................11
24. Entire Agreement ............................................................................................11
25. Amendments .....................................................................................................11
26. Headings ............................................................................................................12
27. Binding Effect ..................................................................................................12
28. Attorneys' Fees ................................................................................................12
29. Safety And Health Programs ........................................................................12
30. Liens ...................................................................................................................13
31. Drugs, Alcohol And Weapons ......................................................................13
32. Non-Publicity ...................................................................................................13
33. Entire Agreement ............................................................ Error! Bookmark not defined.
Appendix A: Contractor Pre-Qualification Safety Questionnaire .................15

## CONTINUING SERVICES AGREEMENT

This Continuing Services Agreement (the "Agreement") is made as of October 1, 2005, ("Effective Date") by and between Calpine Eastern Corporation, a Delaware corporation ("CALPINE"), and AP & M FIELD SERVICES, INC., a Florida corporation ("CONTRACTOR").

WHEREAS, CALPINE is the contract operator of certain power generating facility projects and related projects, and

WHEREAS, CALPINE desires to enter into this Agreement with CONTRACTOR to set forth the general terms and conditions under which CONTRACTOR shall perform services ("Services") as may from time to time be agreed upon in separate purchase orders (each a "Purchase Order" and collectively the "Purchase Orders") related to the services required for CALPINE to perform its responsibilities for operating one or more of the aforementioned projects, and

WHEREAS, CONTRACTOR desires to perform the Services as an independent contractor to CALPINE.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

### 1. PURCHASE ORDERS

CONTRACTOR agrees to perform the Services described in each Purchase Order (as to each Purchase Order, the "Scope of Services") entered into and executed by the parties from time to time. CONTRACTOR and CALPINE may enter into and execute any number of Purchase Orders under this Agreement relating to one or more projects. Each Purchase Order shall be: (i) be separately numbered and (ii) contain at minimum the following information: name of contracting parties, date of this Agreement, date of Purchase Order, specific project location, description of Services to be performed, date when Services are to be performed or delivered, and amount of compensation payable to CONTRACTOR for such Services and is hereby incorporated herein as if fully set forth herein. Notwithstanding the foregoing, if any terms or conditions in the Purchase Order are inconsistent or in conflict with this Agreement, this Agreement shall control. The parties agree that the Purchase Order shall not amend or modify this Agreement. The projects for which the parties enter into a Purchase Order are herein referred to individually as a "Project" and collectively as the "Projects". Any services, work or supplies which may be performed or provided by CONTRACTOR with respect to a particular Project prior to the actual date of execution by CONTRACTOR and CALPINE of an appropriate Purchase Order shall nonetheless be deemed to be performed under this Agreement and all of the provisions hereof shall apply to such services, work and supplies.

### 2. TERM

This Agreement shall be for a term lasting three (3) years from the date first specified above, unless earlier terminated pursuant to this Agreement or extended by a mutual written agreement executed by both parties, provided however, that for a Purchase Order executed during the term of this Agreement, if the performance of the Scope of Services extends beyond the three (3) year term of this Agreement, then the term of this Agreement shall be extended solely for and until completion of the Scope of Services.

3.   COMPENSATION

Compensation to CONTRACTOR for the Scope of Services under each Purchase Order shall be calculated as described in such Purchase Order, whether by fixed price, hourly rates subject to a fixed rate schedule with maximum limits, "cost plus", or other basis as may be described in said Purchase Order. No expenses, costs or liabilities of CONTRACTOR shall be reimbursable by CALPINE unless the obligation and manner of reimbursement is expressly set forth in said Purchase Order. It is expressly understood and agreed that the compensation provided for in each Purchase Order shall be the only payment to which CONTRACTOR shall be entitled for the Scope of Services covered by such Purchase Order, and that CONTRACTOR shall be responsible for any and all taxes, employment benefits and social benefits resulting from or attributable to any payments made hereunder.

4.   PAYMENT

4.1   By the 15th day of each month applicable during the performances of each Purchase Order, CONTRACTOR shall prepare and submit to CALPINE a separate reasonably itemized invoice for each such Purchase Order covering the Services rendered by CONTRACTOR during the preceding month under such Purchase Order, prepared in accordance with the compensation provisions of each applicable Purchase Order, along with a summary statement of all amounts due and outstanding under this Agreement in such form as is designated by CALPINE.

4.2   Itemized invoices shall include, in addition to any special information required by the applicable Purchase Order, an itemization of the work performed, the time expended by each person on each element of the work performed and an itemization of each reimbursable expense (if any) authorized under the Purchase Order, all with such receipts or other substantiation as may reasonably be requested by CALPINE.

4.3   All properly invoiced amounts shall be due and paid to CONTRACTOR within forty-five (45) days after invoice receipt.

4.4   CONTRACTOR shall have one hundred eighty (180) days after the completion of Services to invoice CALPINE for all amounts due and outstanding under each Purchase Order governed by this Agreement.

4.5   Invoices and communications regarding invoices shall be sent directly to the facility that issued the Purchase Order, unless otherwise directed by said Purchase Order.

5.   WARRANTY

In addition to any and all warranties provided or implied by law or public policy, CONTRACTOR warrants that all Services (including but not limited to all equipment and materials supplied in connection therewith) shall be free from defects in workmanship, and that CONTRACTOR shall perform all Services in accordance with all applicable engineering, construction and other codes and standards, in accordance with prudent electrical utility standards, and in accordance with the terms of this Agreement and the Purchase Order applicable to such Services, all with the degree of high professional skill normally exercised by or expected from recognized professional firms engaged in the practice of supplying services of a nature similar to the Services in question. CONTRACTOR further warrants that, in addition to

furnishing all tools, equipment and supplies customarily required for performance of work such as the Services, CONTRACTOR shall furnish personnel with the training, experience and physical ability, as well as adequate supervision, required to perform the Services in accordance with the preceding standards and the other requirements of this Agreement and the Purchase Orders. In addition to all other rights and remedies which CALPINE may have, CALPINE shall have the right to require, and CONTRACTOR shall be obligated at its own expense to perform, all further services which may be required to correct any deficiencies which result from CONTRACTOR's failure to perform any Services in accordance with the standards required by this Agreement or the applicable Purchase Order. Moreover, if, during the term of this Agreement (or during the one year period following the completion of Scope of Services), any equipment, goods or other materials or Services used or provided by CONTRACTOR under this Agreement fail due to defects in material and/or workmanship or other breach of this Agreement, CONTRACTOR shall, upon any reasonable notice from CALPINE, replace or repair the same. Unless otherwise expressly permitted by the applicable Purchase Order or express written change executed as provided under Section 6, all materials and supplies to be used by CONTRACTOR in the performance of the Services shall be new and best of kind.

CONTRACTOR hereby assigns to CALPINE all additional warranties, extended warranties, or benefits like warranties, such as insurance, provided by or reasonably obtainable from suppliers of equipment and material used in the Services.

## 6. CHANGES AND EXTRA SERVICES

6.1    Provided that CALPINE gives reasonable advance notice to CONTRACTOR, CALPINE may propose in writing changes to CONTRACTOR's work within the Scope of Services described in any particular Purchase Order. If CONTRACTOR is of the opinion that any proposed change causes an increase or decrease in the cost, or a change in the schedule for performance, of the Services under such Purchase Order, then within five (5) days after receipt of a written proposal for changes in CONTRACTOR's work under such Purchase Order, CONTRACTOR shall so notify CALPINE of that fact. CONTRACTOR may also initiate such notification, upon identifying a condition which may change the Scope of Services as agreed at the time of execution of the Purchase Order covering such Scope of Services. When and if CALPINE and CONTRACTOR reach agreement on any such proposed change and its effect on the cost and time for performance under any Purchase Order, they shall confirm such agreement in writing as an amendment or supplement to such Purchase Order. In the event that the parties cannot reach agreement as to the proposed change, CONTRACTOR shall not be obligated to perform such change.

6.2    CALPINE shall not be liable for payment for any changes under Section 6.1, nor shall CONTRACTOR be obligated to perform any such changes, except upon such written amendment or supplement; provided that if, upon CALPINE's written request, CONTRACTOR begins work or incurs any other costs or expenses in accordance with a proposed change, CALPINE shall be liable to CONTRACTOR for the amounts due to the date of notification to CONTRACTOR.

7.    DELAYS IN PERFORMANCE

CONTRACTOR shall perform all Services with due diligence upon receipt of a Purchase Order from CALPINE duly executed by both CALPINE and CONTRACTOR. CONTRACTOR shall keep CALPINE reasonably advised of the progress of CONTRACTOR's performance of the Services. In the event that performance of the Services is delayed by causes beyond the reasonable control of CONTRACTOR, and without the fault or negligence of CONTRACTOR, the time (but not the compensation) for the performance of the Services may be adjusted pursuant to Section 6.1 above. CONTRACTOR shall provide CALPINE with written notice of delay, including therein a description of the delay and the steps contemplated or actually taken by CONTRACTOR to mitigate the effect of such delay.

No failure or omission of CALPINE to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by the CONTRACTOR against CALPINE or be deemed a breach of this Agreement if and to the extent that the same is caused by and arises out of acts of God, strikes, lockouts or other labor disturbances, or any cause of a like or different kind beyond the reasonable control of CALPINE.

8.    PROJECT SITE

CONTRACTOR shall perform the Services in such manner as to cause a minimum of interference with CALPINE's operations and the operations of other contractors at each Project site and to protect all persons and property thereon from damage or injury. Upon completion of the Services at a Project site, CONTRACTOR shall leave such Project site clean and free of all tools, equipment, waste materials and rubbish. Each Project site includes the power plant areas, all buildings, offices, and other locations where Services are to be performed, including any access roads. CONTRACTOR shall be solely responsible for the safe transportation and packing in proper containers and storage of any equipment required for performing the Services, whether owned, leased or rented. CALPINE will not be responsible for any such equipment which is lost, stolen or damaged or for any additional rental charges for such equipment. Equipment left or stored at a Project site, with or without permission, is at CONTRACTOR's sole risk. CALPINE may assume that anything left on the work site an unreasonable length of time after said work is completed has been abandoned. Any transportation furnished by CALPINE shall be solely as an accommodation and CALPINE shall have no liability therefore. CONTRACTOR acknowledges and agrees that it shall assume the risk and is solely responsible for its use of any CALPINE-owned equipment and property provided by CALPINE for the performance of Services. CALPINE shall have no liability to CONTRACTOR therefore. In addition, CONTRACTOR further acknowledges and agrees that it shall assume the risk and is solely responsibility for its owned, non-owned and hired automobiles, trucks or other motorized vehicles as well as any equipment, tools, or other property which is utilized by CONTRACTOR on each Project site.

9.    TERMINATION

    9.1    Either party may terminate this Agreement (or any individual Purchase Order) upon seven (7) days' prior written notice in the event of substantial failure by the other party to perform in accordance with the terms of this Agreement (or such Purchase Order) through no fault of the terminating party; provided that such notice shall specify in reasonable detail the nature of such substantial failure of performance; and further provided that if during such seven (7) day period such other party substantially remedies

such performance, this Agreement (or such Purchase Order) shall not be terminated. However, the non-performing party shall not be relieved of the obligation to complete such performance or from liability for any actual (non-consequential) damages caused to the other party by such failure of performance. This Agreement (including any or all Purchase Orders) may be terminated by either party for its convenience without penalty or termination fee, but only upon ten (10) days' prior written notice to the other party.

9.2     Upon receipt of notice of termination from CALPINE, unless otherwise permitted by the foregoing provisions of Section 9.1 or otherwise instructed within the body of such notice, CONTRACTOR shall discontinue its services, and as soon as reasonably possible thereafter, shall, upon written request and at CALPINE's expense deliver to CALPINE all CONTRACTOR non-proprietary data, documents, drawings, reports, estimates, summaries and such other information and materials, as may have been accumulated by CONTRACTOR in the performance of this Agreement, whether completed or in process ("Project Information").

## 10.    INSURANCE

10.1    CONTRACTOR shall maintain in full force and effect during the term of this Agreement, at its sole cost and expense with insurance companies having a Best's Insurance Guide Rating of "A-VII" or better (or otherwise satisfactory to CALPINE) the insurance described below, as well as such other and further insurance or payment and/or performance bonds as CALPINE may reasonably request and shall reimburse CONTRACTOR for, with coverage at levels normal in the ordinary course of its business, but at levels no less than the minimums indicated. A certificate of insurance evidencing such coverages shall be provided to CALPINE prior to performing any Services for CALPINE.

10.1.1 Commercial general liability insurance, including bodily injury, property damage, independent contractors, products/completed operations, contractual, and personal injury liability, with a combined single limit of $1,000,000 each occurrence. Such policy should be written on an "occurrence" (and not a "claims made") basis.

10.1.2 Umbrella liability policy with a combined single limit of $4,000,000 each occurrence. Such policy should be written on an "occurrence" (and not a 'claims made') basis.

10.1.3 Workers Compensation insurance with statutory limits with coverage required under laws, regulations and statutes applicable, and Employer's Liability insurance with limits of not less than $1,000,000.

10.1.4 Business automobile liability insurance covering owned, non-owned and hired automobiles for a combined single limit of $1,000,000.

10.1.5 If any exposure exists, professional liability insurance with a limit of not less than $1,000,000 per claim; such coverage shall be project specific.

10.2    All insurance policies shall be endorsed to provide that all insureds and additional insureds hereunder be given thirty (30) days' advance notice of cancellation or material

change. Insurance policies procured by CONTRACTOR pursuant to this Section 10 shall be endorsed to state that the insurance afforded to CALPINE as an additional insured is sole primary insurance. If CALPINE has other insurance that is applicable to an "occurrence", claim or suit, such other insurance shall apply on an excess basis only.

10.3    CALPINE and their parent, subsidiaries and affiliates, and each of their respective officers, directors, employees, agents, representatives, partners and lenders shall be named as an additional insured under each policy listed above (except for the workers compensation and professional liability policies) and provided a waiver of subrogation.

10.4    This space is intentionally left blank.

10.5    It is expressly acknowledged, understood and agreed that regardless of whether CONTRACTOR provides a satisfactory or an unsatisfactory certificate of insurance pursuant to Section 10.1, and regardless of whether CALPINE allows CONTRACTOR to perform Services for CALPINE, CALPINE has not waived, and is not estopped from asserting against CONTRACTOR, any claim or claims alleging CONTRACTOR's breach of any of its insurance procurement or maintenance obligations under this Section 10.

10.6    In addition to the foregoing insurance requirements, CONTRACTOR shall obtain and maintain in full force and effect during the term of this Agreement, at its sole cost and expense, all-risk property insurance in an amount equal to the full replacement cost value with respect to any equipment, parts, materials or other property of CALPINE ("CALPINE Property") which CONTRACTOR removes or causes to be removed from a Project site for servicing or repair in the course of performing Services hereunder. CONTRACTOR shall be liable for all deductible amounts under any such all-risk property coverage. Notwithstanding that CALPINE shall retain title to such CALPINE Property at all times, CONTRACTOR shall have full care and custody, and shall bear all risk of physical loss or damage with respect to, such CALPINE Property during any period that such property is away from the Project site, except while in transit, and CONTRACTOR shall be obligated to promptly repair or replace all or any portion of the CALPINE Property which is lost, damaged or destroyed during such period. Upon CALPINE'S request, CONTRACTOR shall provide to CALPINE a copy of the insurance policy(ies) required by this Section 10.6

## 11.    SUBCONTRACTING

CONTRACTOR may subcontract any of the Services to one or more subcontractors only with the prior written consent of CALPINE in each case, which consent shall not be unreasonably withheld, delayed or conditioned and shall be deemed approved if not objected to within five (5) business days following the request. CONTRACTOR shall supervise all work subcontracted by CONTRACTOR in performing the Services and shall be responsible for all work performed by a subcontractor as if CONTRACTOR itself had performed such work. The subcontracting of any work to subcontractors shall not relieve CONTRACTOR from any of its obligations under this Agreement with respect to the Services. Subcontracts with Affiliates (as defined herein) of CONTRACTOR shall be on a competitive and arms-length basis. CONTRACTOR is obligated to ensure that any and all subcontractors performing any Services shall be fully insured. CONTRACTOR shall be responsible for paying all costs and charges of all subcontractors and shall indemnify and hold CALPINE harmless from any and all claims, demands, costs, liabilities and expenses (including attorneys' fees) arising out of any work or Services performed by

any subcontractor for CONTRACTOR in connection with the Services or a Project to the same extent (under Section 13) as if CONTRACTOR had itself performed such work or Services. Without limiting the generality of the foregoing, within ten (10) days after written notice from CALPINE, CONTRACTOR shall remove, by payment or by posting and recording statutory and/or other bonds satisfactory to CALPINE, any and all mechanic's or materialman's liens filed or recorded by any subcontractor (or any employee, agent or subcontractor of a subcontractor) against a Project or any real property related to a Project.

## 12.    ASSIGNMENT AND DELEGATION

CONTRACTOR may not assign this Agreement (by operation of law or otherwise), nor (subject to CONTRACTOR's subcontracting rights under Section 11 above), may CONTRACTOR delegate its duties under this Agreement, in each case without the prior written approval of CALPINE. Any such unauthorized attempted assignment or delegation shall be void and unenforceable. CALPINE shall have an absolute right to assign its rights under this Agreement to any financially qualified party, subject to CONTRACTOR's right of reasonable approval, which approval shall not be untimely or unreasonably withheld. Notwithstanding the foregoing, CALPINE may assign this Agreement to an affiliate or in connection with any merger, acquisition or similar event. In no event shall CALPINE be released from any obligation under this Agreement following any assignment of this Agreement.

## 13.    LIABILITY INDEMNITY

13.1    SUBJECT TO SECTION 13.2 BELOW, CONTRACTOR AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS CALPINE, EACH PROJECT OWNER, EACH PROJECT LESSEE (IF ANY), ALL PROJECT RELATED LENDERS, EACH OF THE FOREGOING PARTIES' SHAREHOLDERS, PARTNERS AND OTHER EQUITY HOLDERS, AND ALL OF THE FOREGOING PARTIES' AFFILIATES, EMPLOYEES, DIRECTORS, AGENTS AND REPRESENTATIVES (COLLECTIVELY, "INDEMNITEES"), FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, CLAIMS, LIENS, DEMANDS AND CAUSES OF ACTION OF EVERY TYPE (COLLECTIVELY, "LIABILITIES"), AND ALL COSTS AND EXPENSES ASSOCIATED THEREWITH (INCLUDING WITHOUT LIMITATION JUDGMENTS, PENALTIES, INTEREST, SETTLEMENT FEES, COURT COSTS AND LEGAL FEES) INCURRED BY THE INDEMNITEES, INCLUDING WITHOUT LIMITATION LIABILITIES ASSOCIATED WITH PERSONAL INJURY OR DEATH (INCLUDING WITHOUT LIMITATION INJURY TO OR DEATH OF AN INDEMNITEE OR ITS EMPLOYEES) OR DAMAGE TO PROPERTY (INCLUDING WITHOUT LIMITATION PROPERTY OF INDEMNITEES), WHICH ARISE OUT OF CONTRACTOR'S NEGLIGENCE OR WILFULL MISCONDUCT. NOTWITHSTANDING ANY PROVISION OF THIS SECTION OR ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL CONTRACTOR BE LIABLE FOR CONSEQUENTIAL DAMAGES ASSOCIATED WITH CONTRACTOR'S NEGLIGENCE OR WILLFULL MISCONDUCT.

13.2    THE INDEMNIFICATION AND OTHER PROTECTIONS PROVIDED TO AN INDEMNITEE UNDER SECTION 13.1 SHALL NOT EXTEND TO LIABILITIES DETERMINED PURSUANT TO A FINAL JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE BEEN CAUSED SOLELY BY THE

NEGLIGENCE OF THE PARTICULAR INDEMNITEE CLAIMING INDEMNIFICATION. ADDITIONALLY, IF IT SHOULD BE DETERMINED PURSUANT TO A FINAL JUDGMENT BY A COURT OF COMPETENT JURISDICTION THAT ANY INDEMNIFICATION OR OTHER PROTECTION AFFORDED TO ANY INDEMNITEE UNDER SECTION 13.1 WOULD BE IN VIOLATION OF, OR OTHERWISE PROHIBITED BY, ANY APPLICABLE LAW, THEN SECTION 13.1 SHALL AUTOMATICALLY BE DEEMED TO BE AMENDED IN A MANNER WHICH PROVIDES THE MAXIMUM INDEMNIFICATION AND OTHER PROTECTIONS TO SUCH INDEMNITEE CONSISTENT WITH SUCH APPLICABLE LAW.

13.3    FOR PURPOSES OF THIS INDEMNITY AS WELL AS FOR ALL OTHER PURPOSES OF THIS AGREEMENT, THE TERM "AFFILIATE" SHALL MEAN AN ENTITY, WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, THE ENTITY WITH WHICH THE AFFILIATION IS CLAIMED. VARIATIONS OF THE WORD "CONTROL" AS USED IN THE FOREGOING SENTENCE SHALL, FOR CORPORATIONS, MEAN THE ABILITY TO VOTE FIFTY PERCENT (50%) OR MORE OF THE VOTING STOCK OF SUCH CORPORATION, AND, FOR PARTNERSHIPS, SHALL MEAN STATUS AS A GENERAL PARTNER WITHIN SUCH PARTNERSHIP.

## 14.    DOCUMENTS

The parties hereto agree that CONTRACTOR shall turn over to CALPINE all Project Information that is non-proprietary to CONTRACTOR, including all copies thereof, when and as requested during the term of this Agreement and when the Services under all Purchase Orders have been completed. All such Project Information, including all copies thereof, shall be the property of CALPINE.

## 15.    NON-DISCLOSURE OF INFORMATION

15.1    CONTRACTOR agrees not to use the Project Information for any purpose whatsoever except in a manner specifically provided for in this Agreement.

15.2    The obligations undertaken pursuant to this Article shall not apply to such part of the Project Information which CALPINE has not or does not continue to treat as secret and confidential or which is or has become published or otherwise generally available to the public, other than as a consequence of any act by CONTRACTOR or any of its employees, or which, at the time of disclosure to CONTRACTOR, was already in the lawful possession of CONTRACTOR.

15.3    CONTRACTOR shall impose corresponding obligations of confidentiality on its employees and subcontractors involved in the performance of the Services prior to making the Project Information available to them. A breach of confidentiality of Project Information by any such employee or subcontractor shall be deemed a breach of confidentiality by CONTRACTOR.

15.4    It shall not be a breach of the confidentiality obligations hereof for CONTRACTOR to disclose Project Information where, but only to the extent that, such disclosure is required by law or applicable legal process, provided in such case the CONTRACTOR shall (i)

give CALPINE the earliest notice possible in writing that such disclosure is or may be required and (ii) cooperate with CALPINE in protecting such confidential or proprietary nature of the Project Information which must so be disclosed.

15.5    CONTRACTOR agrees that CALPINE's remedies in law for unauthorized disclosure of Project Information by CONTRACTOR are insufficient. CONTRACTOR agrees that CALPINE shall be entitled to seek equitable remedies without having to prove damages resulting from the unauthorized disclosure of Project Information.

## 16.    AUDITS AND DISPUTES

16.1    CALPINE reserves the right to audit, at any and all reasonable times, all records of CONTRACTOR (including CONTRACTOR's subcontractors) pertaining to the Services, including, without limitation, labor hours, computer usage, cost of materials, reimbursable expenses (if allowed) and any and all costs charged to CALPINE, during, and for a period of two (2) years following, the term of this Agreement.

16.2    CONTRACTOR and CALPINE shall make every attempt to resolve in an amicable way any dispute concerning the interpretation or the performance of this Agreement. Any dispute which cannot be resolved by the parties hereto shall be resolved in a court of competent jurisdiction unless the parties agree to arbitration or other alternative dispute resolution.

## 17.    GOVERNING LAW

This Agreement and any and all Purchase Orders that are subject to the terms of this Agreement shall be governed by and be construed in accordance with the laws of the state where the work was performed with respect to the particular Purchase Order in dispute without regard to its conflict of laws principles. In the event a dispute arises under this Agreement and not any specific Purchase Order, or if a dispute arises with respect to multiple Purchase Orders for work in different States, then the Agreement and, if applicable, the Purchase Orders, shall be governed by and be construed in accordance with the law of the State of New York without regard to its conflict of laws principles. Each party hereby irrevocably agrees that any legal action or proceeding with respect to this Agreement and, if applicable, any Purchase Order, shall be brought in the federal or state Courts of the State of New York. By execution of this Agreement, each party irrevocably submits to each such jurisdiction as provided above and hereby irrevocably waives any and all objections which it may have as to venue in any of the above applicable courts.

## 18.    NOTICES

All notices, correspondence and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when actually received or refused as evidenced by US Postal Service or Federal Express or other third party. Such notices may be given personally, by first class, registered or certified mail, overnight mail, or by facsimile transmission.

If to CALPINE

FTL:1551536:1

Calpine Eastern Corporation
2 Atlantic Avenue; 3rd Floor
Boston, Massachusetts 02110
Attention: Contracts Department

If to CONTRACTOR

AP & M Field Services, Inc.
3030 S. W. 13t Place
Boynton Beach, Florida 33426
Attention: Mr. Robert Enslein

19.    WAIVER

Except as expressly provided by this Agreement or by any Purchase Order, no waiver of any term or condition of this Agreement shall be valid unless made in writing and executed on behalf of the waiving party hereto by a duly authorized representative of that party and specifying the nature and extent of such waiver. Such waiver shall in no event be construed to be a general waiver of any of the terms and conditions contained in this Agreement, but the same shall be strictly limited to the extent and occasion specified in such signed writing. Failure on the part of the party to complain of any act or failure to act on any complaint of the other party, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder, except to the extent such result is expressly provided for under this Agreement or under any Purchase Order.

20.    INVALIDITY OF PROVISIONS

If any provisions of this Agreement are or become invalid, the validity of the remaining provisions shall not be affected thereby. The parties hereto shall jointly seek an arrangement having a legal and economic effect which will be as similar as possible to the invalid provisions.

21.    INDEPENDENT CONTRACTOR

CONTRACTOR acknowledges and agrees that it is an independent contractor and that the performance of the Services shall be entirely under CONTRACTOR's supervision, direction and control, subject to advisory contacts with, periodic reporting to, and compliance with constraints imposed by CALPINE consistent with the terms of this Agreement and of the Purchase Orders, CALPINE being primarily interested in the results to be obtained by CONTRACTOR's performance of the Services. All Services performed must meet the approval of CALPINE and shall be subject to a general right of inspection by or on behalf of CALPINE to verify the satisfactory performance and completion of the Services. CONTRACTOR hereby agrees to indemnify CALPINE and its directors, officers and employees for any claims, losses, costs, fees, liabilities, damages or injuries suffered by CALPINE arising out of CONTRACTOR's breach of this section or a determination by a court or agency that CONTRACTOR or its employees are not independent contractors.

22.    LAWS, REGULATIONS AND COMPANY RULES

CONTRACTOR agrees to obtain, make and file all permits, licenses and other governmental approvals, filings and consents required for performance of the Services and to comply with all federal, state and

local laws, regulations, rules and ordinances. CONTRACTOR agrees to comply in all material respects with all applicable federal, state and local laws, regulations, rules and ordinances, including but not limited to any and all of the same relating to (i) labor and employment matters (including but not limited to laws relating to equal employment opportunities, affirmative action, certification of non-segregated facilities, employment opportunities for handicapped individuals, subcontracting with small business concerns, subcontracting with minority business enterprises), (ii) environmental matters, (iii) health and safety matters and (iv) security matters.

### 23.   SURVIVAL

The rights and obligations of the parties which, by their nature, are normally intended to survive the termination or completion of an agreement similar to this Agreement shall remain in full force and effect following termination of this Agreement for any reason.

### 24.   ENTIRE AGREEMENT

This Agreement, together with Exhibits and Schedules, if any, attached hereto, all of which are incorporated herein as part of this Agreement by this reference, and together with all Purchase Orders, contains the entire agreement between the parties hereto with respect to the subject matter hereof and supercedes all previous agreements, whether written or oral, including all prior Continuing Services Agreements entered into between the parties. The parties agree that this Agreement may be executed in counterparts and via facsimile signatures. In addition, the parties agree to execute two (2) copies of the original Agreement and each party is to retain one original fully executed copy of the Agreement for its records.

### 25.   AMENDMENTS

No amendment to this Agreement or to any Purchase Order shall be binding upon either party hereto, unless it is in writing and executed on behalf of each party hereto by a duly authorized representative and expressly specified as such.

### 26.   HEADINGS

Headings to Sections of this Agreement are to facilitate reference only and shall neither form a part of this Agreement, nor in any way affect the interpretation thereof.

### 27.   BINDING EFFECT

This Agreement shall be binding upon and inure to the benefit of the parties hereto, and to their successors and permitted assigns, but shall not inure to the benefit of any third party.

### 28.   ATTORNEYS' FEES

In the event of litigation concerning the interpretation or enforcement of this Agreement or any Purchase Order, the prevailing party in such litigation, as determined by the Court, shall be entitled to recover from the other party, such prevailing party's reasonable attorneys' fees, as well as its costs.

## 29.    SAFETY AND HEALTH PROGRAMS

The CONTRACTOR shall establish, maintain, and enforce safe work practices, and implement an accident/incident prevention program intended to ensure safe and healthful operations under their direction. The program shall include all requisite components of such a program under Federal, State and local regulations and shall comply with all CALPINE site programs. CONTRACTOR shall complete a Contractor Pre-Qualification Safety Questionnaire, attached to this Agreement as Appendix A ("Safety Questionnaire").

29.1    CONTRACTOR will be responsible for acquiring job hazard assessments as necessary to safely perform all duties of each Project and provide a copy to CALPINE upon request.

29.2    CONTRACTOR will be responsible for providing all employee health and safety training and personal protective equipment in accordance with potential hazards that may be encountered in performance of Project and provide copies of the certified training records upon request by CALPINE.    CONTRACTOR shall be responsible for proper maintenance and/or disposal of their personal protective equipment and material handling equipment.

29.3    CONTRACTOR is responsible for ensuring that its lower-tier subcontractors are aware of and will comply with the requirements set forth herein.

29.4    CALPINE, or their representatives, shall periodically monitor the safety performance of the CONTRACTOR working on the Project.    All CONTRACTORS and their subcontractors shall be required to comply with the safety and health obligations as established in the Agreement. Non-compliance with safety, health, or fire requirements may result in cessation of work activities, until items in non-compliance are corrected.

29.5    CONTRACTOR shall immediately report any injuries to the CALPINE site safety representative.    Additionally, the CONTRACTOR shall investigate and submit to the CALPINE site safety representative copies of all written accident reports, and coordinate with CALPINE if further investigation is requested.

29.6    CONTRACTOR shall take all reasonable steps and precautions to protect the health of their employees and other site personnel with regard to their Scope of Services. Copies of any sampling results will be forwarded to the CALPINE site safety representative upon request.

29.7    CONTRACTOR shall develop a plan to properly handle and dispose of all hazardous wastes they generate within the Scope of Services.

29.8    CONTRACTOR shall advise its employees and subcontractors that any employee, who jeopardizes his/her safety and health, or the safety and health of others, may be subject to actions including removal from Project.

## 30.  LIENS

CONTRACTOR agrees to promptly, upon written notice to it, discharge or cause to be discharged, liens filed by others on account of claims for any labor performed or material or equipment furnished under this Agreement by CONTRACTOR, its subcontractors, agents or representatives.

With it's proposed final invoice, the CONTRACTOR shall deliver to CALPINE a final release of all liens arising out of this Agreement, and receipts in full for all the labor and materials furnished for the project, and an affidavit that so far as it has knowledge or information, the releases and receipts included in all labor and materials for which a lien could be filed. If any lien remains unsatisfied, the CONTRACTOR shall refund to CALPINE all monies that CALPINE may be compelled to pay in discharging such lien, including all costs and attorney's fees.

## 31.  DRUGS, ALCOHOL AND WEAPONS

CONTRACTOR agrees to advise its employees and the employees of its subcontractors and agents that it is the policy of CALPINE that: (i) The use, possession and/or distribution of illegal or unauthorized drugs, drug-related paraphernalia or weapons on CALPINE's premises is prohibited and the use or possession of alcoholic beverages, except where authorized by CALPINE's management, is also prohibited; and (ii) Any person who is found in violation of the policy may be removed and barred from CALPINE's premises, at the direction of CALPINE.

## 32.  NON-PUBLICITY

All media releases, public announcements and other disclosures by either Party relating to this Agreement or the subject matter hereof, including promotional or marketing material, but excluding announcements intended solely for internal distribution or to meet legal or regulatory requirements, shall be coordinated with and approved by the other Party prior to release. In addition, the parties shall refrain from removing, overprinting or defacing any notices of copyright, trademark, logo or other proprietary identifications or notices of confidentiality, from any originals or copies of the other Party's Confidential Information, Notwithstanding the foregoing provisions of this Section, CONTRACTOR may list CALPINE as a customer of CONTRACTOR.

## 33.  ENTIRE AGREEMENT

This Agreement contains the entire agreement of the parties relating to the subject matter hereof. The provisions of this Agreement shall be enforceable notwithstanding the existence of any claim or cause of action of CONTRACTOR against CALPINE whether predicated on this Agreement or otherwise.

IN WITNESS WHEREOF, this Agreement is executed effective as of the day and year first above written.

CALPINE

Calpine Eastern Corporation

By: _____

Title: _Vice President_____

Date: _10/18/2005_____

CONTRACTOR

AP & M Field Services, Inc.

By: _____

Title: General Operations Manager _____

Date: _10/17/05_____

# Exhibit C

2/9/2006            **Purchase Orders**           Page     1

CALPINE KENNEDY OPERATORS, INC.
JFK ENERGY CENTER
JFK AIRPORT BUILDING #49

| | | | |
|---|---|---|---|
| JAMAICA | NY | | 11430 |
| USA | | | |

Telephone No  7,%-995-3732
Ext.
Fax  718-995-3741

| Purchasing Center | JAMAICA |
|---|---|
| PO No. | 06-0053 |
| Release No. | 0 |
| Order Date | 2/9/2006 |
| Request Status | |
| Revision No. | 0.00 |

| VENDOR | AP&M | SHIP TO | CALPINE KENNEDY OPERATORS, INC |
|---|---|---|---|

**VENDOR**  AP&M
AVIATION POWER & MARINE
3030 SOUTHWEST 13TH PLACE

BOYNTON BEACH     FL     33426

Contact     CHRIS MURRAY
Telephone No.     561-732-6000  C 754-264-2905
Ext.     105
Fax     561-732-6562  H 954-978-6406

**SHIP TO**     CALPINE KENNEDY OPERATORS, INC
JFK Energy Center
JFK Airport Building No 49.

Jamaica     NY     11430
USA

Telephone No.     (718) 995-3732

| INVOICE TO | CALPINE KENNEDY OPERATORS, INC | CONFIRM TO | CALPINE KENNEDY OPERATORS, INC |
|---|---|---|---|

**INVOICE TO**     CALPINE KENNEDY OPERATORS, INC
N
JFK Energy Center
JFK Airport Building No 49.

Jamaica     NY     11430
USA

**CONFIRM TO**     CALPINE KENNEDY OPERATORS, INC
JFK Energy Center
JFK Airport Building No 49.

Jamaica     NY     11430
USA

| Freight Terms | | Payment Terms | NET 30 |
|---|---|---|---|
| Ship Via | | | |
| Freight Carrier | | Shipping Terms | UPS |

| Qty Item No./Service Code<br>Unit Cost Center<br>Due Date Account Code | Vendor's Item No.<br>Description<br>Specifications | Receive To ID<br><br>Unit Cost   $ | Total Cost   $ |
|---|---|---|---|
| 1.00 NON-STOCK<br><br>2/9/2006 | PROVIDE LABOR TO COMPLETE SERVICE<br>BULLETIN 213<br>1.   Scope of work:<br>    Comply with Service Bulletin<br>LM6000-IND-213 rev 2<br><br>Manpower:<br>    Estimated manpower will be 2 reps for two<br>12-hour days.<br>    AP&M Field Services Standard Terms and<br>Conditions apply. Quotation is valid for up to thirty<br>(30) days from date of original issue. | 11,480.00 | 11,480.00 |

Approval _(signature)_ Nicholas C. Chiu Date 2/8/06

| | | |
|---|---|---|
| Subtotal | $ | 11,480.00 |
| Tax Charge | $ | 0.00 |
| Shipping | $ | 0.00 |
| Misc. | $ | 0.00 |
| Order Total | $ | 11,480.00 |



AP&M Field Services quote. 013106WA1

Date: January 31, 2006

- Calpine / Kennedy
  Jamaica, NY

- Attention:
  Mike O'Brien

- Date of Service: TBD

1. Scope of work:
   Comply with Service Bulletin LM6000-IND-213 rev 2

   Manpower:
   - Estimated manpower will be 2 reps for two 12-hour days.
   - AP&M Field Services Standard Terms and Conditions apply. Quotation is valid for up to thirty (30) days from date of original issue.

---

- Labor is estimated at $11,480.00 for weekday and $12,280.00 for weekend work. Estimate includes T&L. Estimate does not include any parts.
- Actual labor will be charged at published rates

---

Sincerely,

Woody Altizer

Field Service Manager

# Exhibit D

Aeroderivative gas turbines spare parts distributor and repair/field services for GE LM25...     Page 1 of 2

# PRODUCTS & SERVICES

| HOME | ABOUT | PRODUCTS & SERVICES | QUOTES, ORDERS & FORMS | CONTACT |

::: FIELD SERVICES

AP&M Field Services, Inc. (AP&M Field Services) is a wholly owned subsidiary of AP&M. AP&M Field Services specializes in inspections, field services, and other related activities for GE LM2500, LM2500 Plus, LM5000, and LM6000 engines. Service up to Level II is available in the Americas, with additional service up to Level IV provided by MTU Ludwigsfelde.

At AP&M, your success is our success. The experienced and knowledgeable professionals at AP&M Field Services, Inc. offer diverse industry experience. They are flexible and reliable throughout the entire process, from planning and performing the outage to post outage reports. The job's not done until detailed reports are in the plant manager's hands.

We do it right; we do it on time, the first time. Our extensive on-shelf inventory and dependable field service technicians ensure minimal down time for you and reduce the cost of your outage, whether planned or unplanned, to ensure total customer satisfaction. Our goal is to make sure you have an efficiently operating system and that your industrial gas turbines are up to speed.

The AP&M Field Services team is strategically located throughout the U.S. in FL, TX, CA, and OH. They are on call for immediate dispatch due to forced outages, 24 hours a day, 7 days a week, 365 days a year.

**FIELD SERVICE CAPABILITIES:**
All LM2500 and LM5000 Field Level Tooling
Borescope and Periodic Inspections
Engine and Control System Troubleshooting
Engine and Package Inspections
Engine Change Outs
Fuel System Upgrades
Generator Maintenance/Inspections/Repairs
Hot Section Repair and/or Exchange
Light and Heavy Package Maintenance
Mechanical/Technical Field Support
On-site Controls Support and Upgrades
On-site Repairs and Upgrades
Parts Inspection
Rotable Module and Component Exchange
Service Bulletin Incorporation
Service Bulletin Upgrades
Technical Consultations
Vast LM Parts Selection to Support Our 24/7/365 Field Service Dept.
West and East Coast Dispatch

**Technical Services**
Asset Appraisals

::: REQUEST FOR QUOTE

AP&M prides itself on competitive pricing and superior service. Thank you for the opportunity to quote.

::: SEARCH THIS SITE

Aeroderivative gas turbines spare parts distributor and repair/field services for GE LM25...   Page 2 of 2

Auxiliary Maintenance and Repair
Installation and Upgrade of Water Wash Systems
Insurance Inspections
Start-Up Consulting
Technical Consultations

**Control Support**
Control System Trouble Shooting and Repairs
Modifications and Control Upgrades/Testing
Onsite Controls Support



QUALITY MANAGEMENT S
CERTIFIED BY DNV
ISO 9001:2000

CONTACT US   |   TERMS AND CONDITIONS   |   SITEMAP   |   DOWNLOADS   |   LOGIN

# Exhibit E

 **CALPINE**

CALPINE - JFK ENERGY CENTER
JFK AIRPORT - BUILDING #49
JAMAICA, NEW YORK 11430
718.995.3732
718.995.3741 (fax)

June 30, 2006

AP&M Field Services, Inc.
3030 S. W. 13th Place
Boynton Beach, Florida 33426

Attn: Mr. Robert Enslein

Re: Notice of Damage/Warranty Claim

Dear Mr. Enslein:

AP&M Field Services, Inc. (APM, Aviation Power & Marine), pursuant to a Continuing Service Agreement (CSA) between Calpine Eastern Corporation (Calpine) and APM and a Purchase Order (PO) issued by Calpine Kennedy Operators, Inc. dated February 9, 2006, performed certain work on Gas Turbine #2 (GT #2) at the KIAC Partners (KIAC) facility located at JFK International Airport Bldg #49, Jamaica, New York.

APM's work under this purchase order occurred in March 2006. Specifically, as fully set forth in the attached PO, APM undertook the following work at KIAC:

- Compliance with General Electric (GE) Service Bulletin LM6000-IND-213 rev2 (overhaul of variable stator vanes)

On June 3, 2006 at 1900 hrs, GT #2 experienced an engine stall/unscheduled outage. Borescope inspection of engine onsite and current work at the GE Houston Depot show significant damage to the GT #2 High Pressure Compressor (HPC), Compressor Rear Frame, Combustor as well as other engine components due to this outage. Calpine believes that the shutdown event was caused by APM's failure to adequately perform all aspects of work under above referenced GE Service Bulletin.

Specifically, upon inspection of the engine after the event, Calpine found a Stage 5 variable stator vane lever arm and bolt to be missing. The bolt secures the variable stator vane and allows proper movement of same through the lever function. The missing lever and bolt were located on engine package floor, and both are currently in Calpine's possession.

We believe that the bolt was improperly installed by APM during performance of the work described above and, as a result, the bolt and lever dislodged from the engine. It appears that engine components were damaged by misdirected airflows created by the

improperly installed Stage 5 bolt and variable stator vane lever arm. In addition, there may be other damage and stress to engine components as well.

Repairs to the turbine by GE are currently estimated to cost approximately $2.1 million and again appear to be a direct result by APM's apparent failure to adequately perform all aspects of work under above referenced GE Service Bulletin.

Calpine submits that the work performed by APM caused extensive damage to GT #2 as set forth above. In this regard, the work undertaken by APM was deficient, failed to conform to industry standards and with the requirements of the CSA, including Section 5 of CSA, and the PO. Accordingly, Calpine believes APM is responsible for the damage to GT #2 and associated costs to repair.

Calpine notes that APM has submitted an invoice for the work performed on GT #2. In light of the information submitted herein, Calpine declines, pending further analysis, to make any payment at this time.

In accordance with the terms of the CSA and PO, Calpine reserves its right to take any further action to recover damages associated with damaged turbine.

Please contact me if you have any questions.

Sincerely,

*Michael E. Urio*

Michael E. Urio
Plant Manager

cc:    Calpine Legal and
       Corporate Insurance

# Exhibit F

# SEDGWICK
DETERT, MORAN & ARNOLD LLP

125 Broad Street, 39th Floor
New York, New York 10004-2400
tel: 212.422.0202 fax: 212.422.0925

## Facsimile Transmittal Sheet

DATE: SEPTEMBER 21, 2006

TIME: 11:32 AM

NUMBER OF PAGES: 3 (including cover page)

IF ANY PORTION OF THE FOLLOWING DOCUMENT IS ILLEGIBLE OR MISSING, PLEASE CALL
OUR FAX CENTER AT (212) 422-0202 AS SOON AS POSSIBLE.

## To:

| Name | Company | Facsimile |
|------|---------|-----------|
| Mr. Michael E. Urio, Plant Manager | Calpine - JFK Energy Center | 718-995-3741 |

## From:

Name:     Melissa A. Pena              Fax Back Number:    (212) 422-0925

Office:    New York                     Our File No.:       3057-126822

RE: Calpine Eastern Corporation/AP&M Field Services, Inc.

## MESSAGE:
Please see attached.

PRIVILEGE AND CONFIDENTIALITY NOTICE

The information contained in this facsimile message is attorney privileged and confidential information intended only for the person or entity named above. If you are not the intended recipient (or someone responsible to deliver to the intended recipient), please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone immediately at (212) 422-0202 and return the original message to us at the address above via the U. S. Postal Service. Thank you.

New York  ■  London  ■  San Francisco  ■  Zurich  ■  Los Angeles  ■  Paris  ✕  Newark  ■  Irvine  ■  Chicago  ■  Dallas

NY/486192v1

3D4A N° 2          Fax:2124220925          Sep 21 2006  13:30          P.02


# SEDGWICK
### DETERT, MORAN & ARNOLD LLP

125 Broad Street, 39th Floor
New York, New York 10004-2400
Tel: 212.422.0202  Fax: 212.422.0925

www.sdma.com

September 21, 2006

**VIA FACSIMILIE AT (718) 995-3741 AND FIRST
CLASS MAIL**
Mr. Michael E. Urio
Plant Manager
Calpine – JFK Energy Center
JFK Airport – Building #49
Jamaica, New York 11430

Re:    Calpine Eastern Corporation/AP&M Field Services, Inc.
       Warranty Claim Investigation
       Date of Loss: June 3, 2006
       Our File No.: 3057-126822

Dear Mr. Urio:

This firm represents AP&M Field Services, Inc. ("AP&M"). We are in receipt of your June 30, 2006 letter whereby you allege that, on June 3, 2006, Gas Turbine #2 experienced an engine stall/unscheduled outage, which was purportedly caused by AP&M's inadequate performance of work under General Electric (GE) Service Bulleting LM6000-IND-213 rev2.

This letter serves as a formal demand to inspect Gas Turbine #2. *We request that you immediately provide us with dates for the next two weeks when you will make the gas turbine available for our inspection.*

Additionally, in order to fully evaluate Calpine's claim, we request that you provide the following:

- All maintenance and repair records for Gas Turbine #2 from the date that it was first serviced until the present;

- All photographs (color copies) evidencing the alleged damages to Gas Turbine #2;

- All incident and investigation reports referring to the alleged damages to Gas Turbine #2; and

NY/486076v1

JUMP H- 2        FAX:212422.325        SEP 21 -20.5  12:3C        r. 03

Warranty Claim Investigation
September 21, 2006
Page 2

- Any and all documents referring to the cost and/or estimated cost of repairs.

We will reimburse you for all copying costs.

Also, please take notice that we regard the entire Gas Turbine #2 as constituting material evidence in connection with our investigation. Thus, I ask that you take all steps necessary to ensure that no portion of the turbine is altered or changed until this matter is concluded. Should any destructive testing, repair or other activity be anticipated, planned or scheduled, I ask that you place me on timely notice immediately. We intend to have a representative present for any such activity.

If you will not voluntarily make Gas Turbine #2 available for inspection and/or refuse to produce the requested documents, we will be forced to seek judicial intervention. Given Calpine's obligation as set for in the AP&M Standard Terms & Conditions, we trust that we will not need to resort to motion practice.

Lastly, please direct all future correspondence to AP&M to this firm.

We look forward to hearing from you with the available dates for the inspection and to facilitate the production of documents.

Very truly yours,

*Melisa A P —*

Melissa A. Pena
Sedgwick, Detert, Moran & Arnold LLP

SLH/map

# EXHIBIT B

CONTINUING SERVICES AGREEMENT

BETWEEN

Calpine Eastern Corporation

AND

AP & M Field Services, Inc.

FTL:1551536:1

# TABLE OF CONTENTS

Page

1. PURCHASE ORDERS.................................................................................1
2. TERM.......................................................................................................1
3. COMPENSATION......................................................................................2
4. PAYMENT.................................................................................................2
5. WARRANTY..............................................................................................2
6. CHANGES AND EXTRA SERVICES.............................................................3
7. DELAYS IN PERFORMANCE.......................................................................4
8. PROJECT SITE..........................................................................................4
9. TERMINATION..........................................................................................4
10. INSURANCE.............................................................................................5
11. SUBCONTRACTING..................................................................................6
12. ASSIGNMENT AND DELEGATION..............................................................7
13. LIABILITY INDEMNITY.............................................................................7
14. DOCUMENTS...........................................................................................8
15. NON-DISCLOSURE OF INFORMATION.......................................................8
16. AUDITS AND DISPUTES............................................................................9
17. GOVERNING LAW....................................................................................9
18. NOTICES................................................................................................10
19. WAIVER.................................................................................................10
20. INVALIDITY OF PROVISIONS..................................................................10
21. INDEPENDENT CONTRACTOR.................................................................10
22. LAWS, REGULATIONS AND COMPANY RULES.........................................11
23. SURVIVAL..............................................................................................11
24. ENTIRE AGREEMENT.............................................................................11
25. AMENDMENTS.......................................................................................11
26. HEADINGS.............................................................................................12
27. BINDING EFFECT...................................................................................12
28. ATTORNEYS' FEES.................................................................................12
29. SAFETY AND HEALTH PROGRAMS..........................................................12
30. LIENS....................................................................................................13
31. DRUGS, ALCOHOL AND WEAPONS.........................................................13
32. NON-PUBLICITY.....................................................................................13
33. ENTIRE AGREEMENT.................................................... ERROR! BOOKMARK NOT DEFINED.
APPENDIX A: CONTRACTOR PRE-QUALIFICATION SAFETY QUESTIONNAIRE.....................................15

# CONTINUING SERVICES AGREEMENT

This Continuing Services Agreement (the "Agreement") is made as of October 1, 2005, ("Effective Date") by and between Calpine Eastern Corporation, a Delaware corporation ("CALPINE"), and AP & M FIELD SERVICES, INC., a Florida corporation ("CONTRACTOR").

WHEREAS, CALPINE is the contract operator of certain power generating facility projects and related projects, and

WHEREAS, CALPINE desires to enter into this Agreement with CONTRACTOR to set forth the general terms and conditions under which CONTRACTOR shall perform services ("Services") as may from time to time be agreed upon in separate purchase orders (each a "Purchase Order" and collectively the "Purchase Orders") related to the services required for CALPINE to perform its responsibilities for operating one or more of the aforementioned projects, and

WHEREAS, CONTRACTOR desires to perform the Services as an independent contractor to CALPINE.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

## 1.    PURCHASE ORDERS

CONTRACTOR agrees to perform the Services described in each Purchase Order (as to each Purchase Order, the "Scope of Services") entered into and executed by the parties from time to time. CONTRACTOR and CALPINE may enter into and execute any number of Purchase Orders under this Agreement relating to one or more projects. Each Purchase Order shall be: (i) be separately numbered and (ii) contain at minimum the following information: name of contracting parties, date of this Agreement, date of Purchase Order, specific project location, description of Services to be performed, date when Services are to be performed or delivered, and amount of compensation payable to CONTRACTOR for such Services and is hereby incorporated herein as if fully set forth herein. Notwithstanding the foregoing, if any terms or conditions in the Purchase Order are inconsistent or in conflict with this Agreement, this Agreement shall control. The parties agree that the Purchase Order shall not amend or modify this Agreement. The projects for which the parties enter into a Purchase Order are herein referred to individually as a "Project" and collectively as the "Projects". Any services, work or supplies which may be performed or provided by CONTRACTOR with respect to a particular Project prior to the actual date of execution by CONTRACTOR and CALPINE of an appropriate Purchase Order shall nonetheless be deemed to be performed under this Agreement and all of the provisions hereof shall apply to such services, work and supplies.

## 2.    TERM

This Agreement shall be for a term lasting three (3) years from the date first specified above, unless earlier terminated pursuant to this Agreement or extended by a mutual written agreement executed by both parties, provided however, that for a Purchase Order executed during the term of this Agreement, if the performance of the Scope of Services extends beyond the three (3) year term of this Agreement, then the term of this Agreement shall be extended solely for and until completion of the Scope of Services.

FTL:1551536:1

3.    COMPENSATION

Compensation to CONTRACTOR for the Scope of Services under each Purchase Order shall be calculated as described in such Purchase Order, whether by fixed price, hourly rates subject to a fixed rate schedule with maximum limits, "cost plus", or other basis as may be described in said Purchase Order. No expenses, costs or liabilities of CONTRACTOR shall be reimbursable by CALPINE unless the obligation and manner of reimbursement is expressly set forth in said Purchase Order. It is expressly understood and agreed that the compensation provided for in each Purchase Order shall be the only payment to which CONTRACTOR shall be entitled for the Scope of Services covered by such Purchase Order, and that CONTRACTOR shall be responsible for any and all taxes, employment benefits and social benefits resulting from or attributable to any payments made hereunder.

4.    PAYMENT

4.1    By the 15th day of each month applicable during the performances of each Purchase Order, CONTRACTOR shall prepare and submit to CALPINE a separate reasonably itemized invoice for each such Purchase Order covering the Services rendered by CONTRACTOR during the preceding month under such Purchase Order, prepared in accordance with the compensation provisions of each applicable Purchase Order, along with a summary statement of all amounts due and outstanding under this Agreement in such form as is designated by CALPINE.

4.2    Itemized invoices shall include, in addition to any special information required by the applicable Purchase Order, an itemization of the work performed, the time expended by each person on each element of the work performed and an itemization of each reimbursable expense (if any) authorized under the Purchase Order, all with such receipts or other substantiation as may reasonably be requested by CALPINE.

4.3    All properly invoiced amounts shall be due and paid to CONTRACTOR within forty-five (45) days after invoice receipt.

4.4    CONTRACTOR shall have one hundred eighty (180) days after the completion of Services to invoice CALPINE for all amounts due and outstanding under each Purchase Order governed by this Agreement.

4.5    Invoices and communications regarding invoices shall be sent directly to the facility that issued the Purchase Order, unless otherwise directed by said Purchase Order.

5.    WARRANTY

In addition to any and all warranties provided or implied by law or public policy, CONTRACTOR warrants that all Services (including but not limited to all equipment and materials supplied in connection therewith) shall be free from defects in workmanship, and that CONTRACTOR shall perform all Services in accordance with all applicable engineering, construction and other codes and standards, in accordance with prudent electrical utility standards, and in accordance with the terms of this Agreement and the Purchase Order applicable to such Services, all with the degree of high professional skill normally exercised by or expected from recognized professional firms engaged in the practice of supplying services of a nature similar to the Services in question. CONTRACTOR further warrants that, in addition to

furnishing all tools, equipment and supplies customarily required for performance of work such as the Services, CONTRACTOR shall furnish personnel with the training, experience and physical ability, as well as adequate supervision, required to perform the Services in accordance with the preceding standards and the other requirements of this Agreement and the Purchase Orders. In addition to all other rights and remedies which CALPINE may have, CALPINE shall have the right to require, and CONTRACTOR shall be obligated at its own expense to perform, all further services which may be required to correct any deficiencies which result from CONTRACTOR's failure to perform any Services in accordance with the standards required by this Agreement or the applicable Purchase Order. Moreover, if, during the term of this Agreement (or during the one year period following the completion of Scope of Services), any equipment, goods or other materials or Services used or provided by CONTRACTOR under this Agreement fail due to defects in material and/or workmanship or other breach of this Agreement, CONTRACTOR shall, upon any reasonable notice from CALPINE, replace or repair the same. Unless otherwise expressly permitted by the applicable Purchase Order or express written change executed as provided under Section 6, all materials and supplies to be used by CONTRACTOR in the performance of the Services shall be new and best of kind.

CONTRACTOR hereby assigns to CALPINE all additional warranties, extended warranties, or benefits like warranties, such as insurance, provided by or reasonably obtainable from suppliers of equipment and material used in the Services.

6.    **CHANGES AND EXTRA SERVICES**

6.1    Provided that CALPINE gives reasonable advance notice to CONTRACTOR, CALPINE may propose in writing changes to CONTRACTOR's work within the Scope of Services described in any particular Purchase Order. If CONTRACTOR is of the opinion that any proposed change causes an increase or decrease in the cost, or a change in the schedule for performance, of the Services under such Purchase Order, then within five (5) days after receipt of a written proposal for changes in CONTRACTOR's work under such Purchase Order, CONTRACTOR shall so notify CALPINE of that fact. CONTRACTOR may also initiate such notification, upon identifying a condition which may change the Scope of Services as agreed at the time of execution of the Purchase Order covering such Scope of Services. When and if CALPINE and CONTRACTOR reach agreement on any such proposed change and its effect on the cost and time for performance under any Purchase Order, they shall confirm such agreement in writing as an amendment or supplement to such Purchase Order. In the event that the parties cannot reach agreement as to the proposed change, CONTRACTOR shall not be obligated to perform such change.

6.2    CALPINE shall not be liable for payment for any changes under Section 6.1, nor shall CONTRACTOR be obligated to perform any such changes, except upon such written amendment or supplement; provided that if, upon CALPINE's written request, CONTRACTOR begins work or incurs any other costs or expenses in accordance with a proposed change, CALPINE shall be liable to CONTRACTOR for the amounts due to the date of notification to CONTRACTOR.

7.    DELAYS IN PERFORMANCE

CONTRACTOR shall perform all Services with due diligence upon receipt of a Purchase Order from CALPINE duly executed by both CALPINE and CONTRACTOR.   CONTRACTOR shall keep CALPINE reasonably advised of the progress of CONTRACTOR's performance of the Services.  In the event that performance of the Services is delayed by causes beyond the reasonable control of CONTRACTOR, and without the fault or negligence of CONTRACTOR, the time (but not the compensation) for the performance of the Services may be adjusted pursuant to Section 6.1 above. CONTRACTOR shall provide CALPINE with written notice of delay, including therein a description of the delay and the steps contemplated or actually taken by CONTRACTOR to mitigate the effect of such delay.

No failure or omission of CALPINE to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by the CONTRACTOR against CALPINE or be deemed a breach of this Agreement if and to the extent that the same is caused by and arises out of acts of God, strikes, lockouts or other labor disturbances, or any cause of a like or different kind beyond the reasonable control of CALPINE.

8.    PROJECT SITE

CONTRACTOR shall perform the Services in such manner as to cause a minimum of interference with CALPINE's operations and the operations of other contractors at each Project site and to protect all persons and property thereon from damage or injury.  Upon completion of the Services at a Project site, CONTRACTOR shall leave such Project site clean and free of all tools, equipment, waste materials and rubbish.  Each Project site includes the power plant areas, all buildings, offices, and other locations where Services are to be performed, including any access roads.  CONTRACTOR shall be solely responsible for the safe transportation and packing in proper containers and storage of any equipment required for performing the Services, whether owned, leased or rented.  CALPINE will not be responsible for any such equipment which is lost, stolen or damaged or for any additional rental charges for such equipment. Equipment left or stored at a Project site, with or without permission, is at CONTRACTOR's sole risk. CALPINE may assume that anything left on the work site an unreasonable length of time after said work is completed has been abandoned.  Any transportation furnished by CALPINE shall be solely as an accommodation and CALPINE shall have no liability therefore.  CONTRACTOR acknowledges and agrees that it shall assume the risk and is solely responsible for its use of any CALPINE-owned equipment and property provided by CALPINE for the performance of Services.  CALPINE shall have no liability to CONTRACTOR therefore.  In addition, CONTRACTOR further acknowledges and agrees that it shall assume the risk and is solely responsibility for its owned, non-owned and hired automobiles, trucks or other motorized vehicles as well as any equipment, tools, or other property which is utilized by CONTRACTOR on each Project site.

9.    TERMINATION

9.1    Either party may terminate this Agreement (or any individual Purchase Order) upon seven (7) days' prior written notice in the event of substantial failure by the other party to perform in accordance with the terms of this Agreement (or such Purchase Order) through no fault of the terminating party; provided that such notice shall specify in reasonable detail the nature of such substantial failure of performance; and further provided that if during such seven (7) day period such other party substantially remedies

such performance, this Agreement (or such Purchase Order) shall not be terminated. However, the non-performing party shall not be relieved of the obligation to complete such performance or from liability for any actual (non-consequential) damages caused to the other party by such failure of performance. This Agreement (including any or all Purchase Orders) may be terminated by either party for its convenience without penalty or termination fee, but only upon ten (10) days' prior written notice to the other party.

9.2     Upon receipt of notice of termination from CALPINE, unless otherwise permitted by the foregoing provisions of Section 9.1 or otherwise instructed within the body of such notice, CONTRACTOR shall discontinue its services, and as soon as reasonably possible thereafter, shall, upon written request and at CALPINE's expense deliver to CALPINE all CONTRACTOR non-proprietary data, documents, drawings, reports, estimates, summaries and such other information and materials, as may have been accumulated by CONTRACTOR in the performance of this Agreement, whether completed or in process ("Project Information").

## 10.     INSURANCE

10.1     CONTRACTOR shall maintain in full force and effect during the term of this Agreement, at its sole cost and expense with insurance companies having a Best's Insurance Guide Rating of "A-VII" or better (or otherwise satisfactory to CALPINE) the insurance described below, as well as such other and further insurance or payment and/or performance bonds as CALPINE may reasonably request and shall reimburse CONTRACTOR for, with coverage at levels normal in the ordinary course of its business, but at levels no less than the minimums indicated. A certificate of insurance evidencing such coverages shall be provided to CALPINE prior to performing any Services for CALPINE.

10.1.1 Commercial general liability insurance, including bodily injury, property damage, independent contractors, products/completed operations, contractual, and personal injury liability, with a combined single limit of $1,000,000 each occurrence. Such policy should be written on an "occurrence" (and not a "claims made") basis.

10.1.2 Umbrella liability policy with a combined single limit of $4,000,000 each occurrence. Such policy should be written on an "occurrence" (and not a 'claims made') basis.

10.1.3 Workers Compensation insurance with statutory limits with coverage required under laws, regulations and statutes applicable, and Employer's Liability insurance with limits of not less than $1,000,000.

10.1.4 Business automobile liability insurance covering owned, non-owned and hired automobiles for a combined single limit of $1,000,000.

10.1.5 If any exposure exists, professional liability insurance with a limit of not less than $1,000,000 per claim; such coverage shall be project specific.

10.2     All insurance policies shall be endorsed to provide that all insureds and additional insureds hereunder be given thirty (30) days' advance notice of cancellation or material

change. Insurance policies procured by CONTRACTOR pursuant to this Section 10 shall be endorsed to state that the insurance afforded to CALPINE as an additional insured is sole primary insurance. If CALPINE has other insurance that is applicable to an "occurrence", claim or suit, such other insurance shall apply on an excess basis only.

10.3    CALPINE and their parent, subsidiaries and affiliates, and each of their respective officers, directors, employees, agents, representatives, partners and lenders shall be named as an additional insured under each policy listed above (except for the workers compensation and professional liability policies) and provided a waiver of subrogation.

10.4    This space is intentionally left blank.

10.5    It is expressly acknowledged, understood and agreed that regardless of whether CONTRACTOR provides a satisfactory or an unsatisfactory certificate of insurance pursuant to Section 10.1, and regardless of whether CALPINE allows CONTRACTOR to perform Services for CALPINE, CALPINE has not waived, and is not estopped from asserting against CONTRACTOR, any claim or claims alleging CONTRACTOR's breach of any of its insurance procurement or maintenance obligations under this Section 10.

10.6    In addition to the foregoing insurance requirements, CONTRACTOR shall obtain and maintain in full force and effect during the term of this Agreement, at its sole cost and expense, all-risk property insurance in an amount equal to the full replacement cost value with respect to any equipment, parts, materials or other property of CALPINE ("CALPINE Property") which CONTRACTOR removes or causes to be removed from a Project site for servicing or repair in the course of performing Services hereunder. CONTRACTOR shall be liable for all deductible amounts under any such all-risk property coverage. Notwithstanding that CALPINE shall retain title to such CALPINE Property at all times, CONTRACTOR shall have full care and custody, and shall bear all risk of physical loss or damage with respect to, such CALPINE Property during any period that such property is away from the Project site, except while in transit, and CONTRACTOR shall be obligated to promptly repair or replace all or any portion of the CALPINE Property which is lost, damaged or destroyed during such period. Upon CALPINE'S request, CONTRACTOR shall provide to CALPINE a copy of the insurance policy(ies) required by this Section 10.6

## 11.    SUBCONTRACTING

CONTRACTOR may subcontract any of the Services to one or more subcontractors only with the prior written consent of CALPINE in each case, which consent shall not be unreasonably withheld, delayed or conditioned and shall be deemed approved if not objected to within five (5) business days following the request. CONTRACTOR shall supervise all work subcontracted by CONTRACTOR in performing the Services and shall be responsible for all work performed by a subcontractor as if CONTRACTOR itself had performed such work. The subcontracting of any work to subcontractors shall not relieve CONTRACTOR from any of its obligations under this Agreement with respect to the Services. Subcontracts with Affiliates (as defined herein) of CONTRACTOR shall be on a competitive and arms-length basis. CONTRACTOR is obligated to ensure that any and all subcontractors performing any Services shall be fully insured. CONTRACTOR shall be responsible for paying all costs and charges of all subcontractors and shall indemnify and hold CALPINE harmless from any and all claims, demands, costs, liabilities and expenses (including attorneys' fees) arising out of any work or Services performed by

any subcontractor for CONTRACTOR in connection with the Services or a Project to the same extent (under Section 13) as if CONTRACTOR had itself performed such work or Services. Without limiting the generality of the foregoing, within ten (10) days after written notice from CALPINE, CONTRACTOR shall remove, by payment or by posting and recording statutory and/or other bonds satisfactory to CALPINE, any and all mechanic's or materialman's liens filed or recorded by any subcontractor (or any employee, agent or subcontractor of a subcontractor) against a Project or any real property related to a Project.

## 12.    ASSIGNMENT AND DELEGATION

CONTRACTOR may not assign this Agreement (by operation of law or otherwise), nor (subject to CONTRACTOR's subcontracting rights under Section 11 above), may CONTRACTOR delegate its duties under this Agreement, in each case without the prior written approval of CALPINE. Any such unauthorized attempted assignment or delegation shall be void and unenforceable. CALPINE shall have an absolute right to assign its rights under this Agreement to any financially qualified party, subject to CONTRACTOR's right of reasonable approval, which approval shall not be untimely or unreasonably withheld. Notwithstanding the foregoing, CALPINE may assign this Agreement to an affiliate or in connection with any merger, acquisition or similar event. In no event shall CALPINE be released from any obligation under this Agreement following any assignment of this Agreement.

## 13.    LIABILITY INDEMNITY

13.1    SUBJECT TO SECTION 13.2 BELOW, CONTRACTOR AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS CALPINE, EACH PROJECT OWNER, EACH PROJECT LESSEE (IF ANY), ALL PROJECT RELATED LENDERS, EACH OF THE FOREGOING PARTIES' SHAREHOLDERS, PARTNERS AND OTHER EQUITY HOLDERS, AND ALL OF THE FOREGOING PARTIES' AFFILIATES, EMPLOYEES, DIRECTORS, AGENTS AND REPRESENTATIVES (COLLECTIVELY, "INDEMNITEES"), FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, CLAIMS, LIENS, DEMANDS AND CAUSES OF ACTION OF EVERY TYPE (COLLECTIVELY, "LIABILITIES"), AND ALL COSTS AND EXPENSES ASSOCIATED THEREWITH (INCLUDING WITHOUT LIMITATION JUDGMENTS, PENALTIES, INTEREST, SETTLEMENT FEES, COURT COSTS AND LEGAL FEES) INCURRED BY THE INDEMNITEES, INCLUDING WITHOUT LIMITATION LIABILITIES ASSOCIATED WITH PERSONAL INJURY OR DEATH (INCLUDING WITHOUT LIMITATION INJURY TO OR DEATH OF AN INDEMNITEE OR ITS EMPLOYEES) OR DAMAGE TO PROPERTY (INCLUDING WITHOUT LIMITATION PROPERTY OF INDEMNITEES), WHICH ARISE OUT OF CONTRACTOR'S NEGLIGENCE OR WILFULL MISCONDUCT. NOTWITHSTANDING ANY PROVISION OF THIS SECTION OR ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL CONTRACTOR BE LIABILE FOR CONSEQUENTIAL DAMAGES ASSOCIATED WITH CONTRACTOR'S NEGLIGENCE OR WILLFULL MISCONDUCT.

13.2    THE INDEMNIFICATION AND OTHER PROTECTIONS PROVIDED TO AN INDEMNITEE UNDER SECTION 13.1 SHALL NOT EXTEND TO LIABILITIES DETERMINED PURSUANT TO A FINAL JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE BEEN CAUSED SOLELY BY THE

NEGLIGENCE OF THE PARTICULAR INDEMNITEE CLAIMING INDEMNIFICATION. ADDITIONALLY, IF IT SHOULD BE DETERMINED PURSUANT TO A FINAL JUDGMENT BY A COURT OF COMPETENT JURISDICTION THAT ANY INDEMNIFICATION OR OTHER PROTECTION AFFORDED TO ANY INDEMNITEE UNDER SECTION 13.1 WOULD BE IN VIOLATION OF, OR OTHERWISE PROHIBITED BY, ANY APPLICABLE LAW, THEN SECTION 13.1 SHALL AUTOMATICALLY BE DEEMED TO BE AMENDED IN A MANNER WHICH PROVIDES THE MAXIMUM INDEMNIFICATION AND OTHER PROTECTIONS TO SUCH INDEMNITEE CONSISTENT WITH SUCH APPLICABLE LAW.

13.3    FOR PURPOSES OF THIS INDEMNITY AS WELL AS FOR ALL OTHER PURPOSES OF THIS AGREEMENT, THE TERM "AFFILIATE" SHALL MEAN AN ENTITY, WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, THE ENTITY WITH WHICH THE AFFILIATION IS CLAIMED. VARIATIONS OF THE WORD "CONTROL" AS USED IN THE FOREGOING SENTENCE SHALL, FOR CORPORATIONS, MEAN THE ABILITY TO VOTE FIFTY PERCENT (50%) OR MORE OF THE VOTING STOCK OF SUCH CORPORATION, AND, FOR PARTNERSHIPS, SHALL MEAN STATUS AS A GENERAL PARTNER WITHIN SUCH PARTNERSHIP.

## 14.    DOCUMENTS

The parties hereto agree that CONTRACTOR shall turn over to CALPINE all Project Information that is non-proprietary to CONTRACTOR, including all copies thereof, when and as requested during the term of this Agreement and when the Services under all Purchase Orders have been completed. All such Project Information, including all copies thereof, shall be the property of CALPINE.

## 15.    NON-DISCLOSURE OF INFORMATION

15.1    CONTRACTOR agrees not to use the Project Information for any purpose whatsoever except in a manner specifically provided for in this Agreement.

15.2    The obligations undertaken pursuant to this Article shall not apply to such part of the Project Information which CALPINE has not or does not continue to treat as secret and confidential or which is or has become published or otherwise generally available to the public, other than as a consequence of any act by CONTRACTOR or any of its employees, or which, at the time of disclosure to CONTRACTOR, was already in the lawful possession of CONTRACTOR.

15.3    CONTRACTOR shall impose corresponding obligations of confidentiality on its employees and subcontractors involved in the performance of the Services prior to making the Project Information available to them. A breach of confidentiality of Project Information by any such employee or subcontractor shall be deemed a breach of confidentiality by CONTRACTOR.

15.4    It shall not be a breach of the confidentiality obligations hereof for CONTRACTOR to disclose Project Information where, but only to the extent that, such disclosure is required by law or applicable legal process, provided in such case the CONTRACTOR shall (i)

give CALPINE the earliest notice possible in writing that such disclosure is or may be required and (ii) cooperate with CALPINE in protecting such confidential or proprietary nature of the Project Information which must so be disclosed.

15.5     CONTRACTOR agrees that CALPINE's remedies in law for unauthorized disclosure of Project Information by CONTRACTOR are insufficient. CONTRACTOR agrees that CALPINE shall be entitled to seek equitable remedies without having to prove damages resulting from the unauthorized disclosure of Project Information.

## 16.   AUDITS AND DISPUTES

16.1     CALPINE reserves the right to audit, at any and all reasonable times, all records of CONTRACTOR (including CONTRACTOR's subcontractors) pertaining to the Services, including, without limitation, labor hours, computer usage, cost of materials, reimbursable expenses (if allowed) and any and all costs charged to CALPINE, during, and for a period of two (2) years following, the term of this Agreement.

16.2     CONTRACTOR and CALPINE shall make every attempt to resolve in an amicable way any dispute concerning the interpretation or the performance of this Agreement. Any dispute which cannot be resolved by the parties hereto shall be resolved in a court of competent jurisdiction unless the parties agree to arbitration or other alternative dispute resolution.

## 17.   GOVERNING LAW

This Agreement and any and all Purchase Orders that are subject to the terms of this Agreement shall be governed by and be construed in accordance with the laws of the state where the work was performed with respect to the particular Purchase Order in dispute without regard to its conflict of laws principles. In the event a dispute arises under this Agreement and not any specific Purchase Order, or if a dispute arises with respect to multiple Purchase Orders for work in different States, then the Agreement and, if applicable, the Purchase Orders, shall be governed by and be construed in accordance with the law of the State of New York without regard to its conflict of laws principles. Each party hereby irrevocably agrees that any legal action or proceeding with respect to this Agreement and, if applicable, any Purchase Order, shall be brought in the federal or state Courts of the State of New York. By execution of this Agreement, each party irrevocably submits to each such jurisdiction as provided above and hereby irrevocably waives any and all objections which it may have as to venue in any of the above applicable courts.

## 18.   NOTICES

All notices, correspondence and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when actually received or refused as evidenced by US Postal Service or Federal Express or other third party. Such notices may be given personally, by first class, registered or certified mail, overnight mail, or by facsimile transmission.

If to CALPINE

FTL:1551536;1

Calpine Eastern Corporation
2 Atlantic Avenue, 3rd Floor
Boston, Massachusetts 02110
Attention: Contracts Department

If to CONTRACTOR

AP & M Field Services, Inc.
3030 S. W. 13t Place
Boynton Beach, Florida 33426
Attention: Mr. Robert Enslein

### 19.    WAIVER

Except as expressly provided by this Agreement or by any Purchase Order, no waiver of any term or condition of this Agreement shall be valid unless made in writing and executed on behalf of the waiving party hereto by a duly authorized representative of that party and specifying the nature and extent of such waiver. Such waiver shall in no event be construed to be a general waiver of any of the terms and conditions contained in this Agreement, but the same shall be strictly limited to the extent and occasion specified in such signed writing. Failure on the part of the party to complain of any act or failure to act on any complaint of the other party, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder, except to the extent such result is expressly provided for under this Agreement or under any Purchase Order.

### 20.    INVALIDITY OF PROVISIONS

If any provisions of this Agreement are or become invalid, the validity of the remaining provisions shall not be affected thereby. The parties hereto shall jointly seek an arrangement having a legal and economic effect which will be as similar as possible to the invalid provisions.

### 21.    INDEPENDENT CONTRACTOR

CONTRACTOR acknowledges and agrees that it is an independent contractor and that the performance of the Services shall be entirely under CONTRACTOR's supervision, direction and control, subject to advisory contacts with, periodic reporting to, and compliance with constraints imposed by CALPINE consistent with the terms of this Agreement and of the Purchase Orders, CALPINE being primarily interested in the results to be obtained by CONTRACTOR's performance of the Services. All Services performed must meet the approval of CALPINE and shall be subject to a general right of inspection by or on behalf of CALPINE to verify the satisfactory performance and completion of the Services. CONTRACTOR hereby agrees to indemnify CALPINE and its directors, officers and employees for any claims, losses, costs, fees, liabilities, damages or injuries suffered by CALPINE arising out of CONTRACTOR's breach of this section or a determination by a court or agency that CONTRACTOR or its employees are not independent contractors.

### 22.    LAWS, REGULATIONS AND COMPANY RULES

CONTRACTOR agrees to obtain, make and file all permits, licenses and other governmental approvals, filings and consents required for performance of the Services and to comply with all federal, state and

local laws, regulations, rules and ordinances. CONTRACTOR agrees to comply in all material respects with all applicable federal, state and local laws, regulations, rules and ordinances, including but not limited to any and all of the same relating to (i) labor and employment matters (including but not limited to laws relating to equal employment opportunities, affirmative action, certification of non-segregated facilities, employment opportunities for handicapped individuals, subcontracting with small business concerns, subcontracting with minority business enterprises), (ii) environmental matters, (iii) health and safety matters and (iv) security matters.

### 23.    SURVIVAL

The rights and obligations of the parties which, by their nature, are normally intended to survive the termination or completion of an agreement similar to this Agreement shall remain in full force and effect following termination of this Agreement for any reason.

### 24.    ENTIRE AGREEMENT

This Agreement, together with Exhibits and Schedules, if any, attached hereto, all of which are incorporated herein as part of this Agreement by this reference, and together with all Purchase Orders, contains the entire agreement between the parties hereto with respect to the subject matter hereof and supercedes all previous agreements, whether written or oral, including all prior Continuing Services Agreements entered into between the parties. The parties agree that this Agreement may be executed in counterparts and via facsimile signatures. In addition, the parties agree to execute two (2) copies of the original Agreement and each party is to retain one original fully executed copy of the Agreement for its records.

### 25.    AMENDMENTS

No amendment to this Agreement or to any Purchase Order shall be binding upon either party hereto, unless it is in writing and executed on behalf of each party hereto by a duly authorized representative and expressly specified as such.

### 26.    HEADINGS

Headings to Sections of this Agreement are to facilitate reference only and shall neither form a part of this Agreement, nor in any way affect the interpretation thereof.

### 27.    BINDING EFFECT

This Agreement shall be binding upon and inure to the benefit of the parties hereto, and to their successors and permitted assigns, but shall not inure to the benefit of any third party.

### 28.    ATTORNEYS' FEES

In the event of litigation concerning the interpretation or enforcement of this Agreement or any Purchase Order, the prevailing party in such litigation, as determined by the Court, shall be entitled to recover from the other party, such prevailing party's reasonable attorneys' fees, as well as its costs.

## 29.    SAFETY AND HEALTH PROGRAMS

The CONTRACTOR shall establish, maintain, and enforce safe work practices, and implement an accident/incident prevention program intended to ensure safe and healthful operations under their direction. The program shall include all requisite components of such a program under Federal, State and local regulations and shall comply with all CALPINE site programs. CONTRACTOR shall complete a Contractor Pre-Qualification Safety Questionnaire, attached to this Agreement as Appendix A ("Safety Questionnaire").

29.1    CONTRACTOR will be responsible for acquiring job hazard assessments as necessary to safely perform all duties of each Project and provide a copy to CALPINE upon request.

29.2    CONTRACTOR will be responsible for providing all employee health and safety training and personal protective equipment in accordance with potential hazards that may be encountered in performance of Project and provide copies of the certified training records upon request by CALPINE.    CONTRACTOR shall be responsible for proper maintenance and/or disposal of their personal protective equipment and material handling equipment.

29.3    CONTRACTOR is responsible for ensuring that its lower-tier subcontractors are aware of and will comply with the requirements set forth herein.

29.4    CALPINE, or their representatives, shall periodically monitor the safety performance of the CONTRACTOR working on the Project.    All CONTRACTORS and their subcontractors shall be required to comply with the safety and health obligations as established in the Agreement. Non-compliance with safety, health, or fire requirements may result in cessation of work activities, until items in non-compliance are corrected.

29.5    CONTRACTOR shall immediately report any injuries to the CALPINE site safety representative. Additionally, the CONTRACTOR shall investigate and submit to the CALPINE site safety representative copies of all written accident reports, and coordinate with CALPINE if further investigation is requested.

29.6    CONTRACTOR shall take all reasonable steps and precautions to protect the health of their employees and other site personnel with regard to their Scope of Services. Copies of any sampling results will be forwarded to the CALPINE site safety representative upon request.

29.7    CONTRACTOR shall develop a plan to properly handle and dispose of all hazardous wastes they generate within the Scope of Services.

29.8    CONTRACTOR shall advise its employees and subcontractors that any employee, who jeopardizes his/her safety and health, or the safety and health of others, may be subject to actions including removal from Project.

30.    LIENS

CONTRACTOR agrees to promptly, upon written notice to it, discharge or cause to be discharged, liens filed by others on account of claims for any labor performed or material or equipment furnished under this Agreement by CONTRACTOR, its subcontractors, agents or representatives.

With it's proposed final invoice, the CONTRACTOR shall deliver to CALPINE a final release of all liens arising out of this Agreement, and receipts in full for all the labor and materials furnished for the project, and an affidavit that so far as it has knowledge or information, the releases and receipts included in all labor and materials for which a lien could be filed. If any lien remains unsatisfied, the CONTRACTOR shall refund to CALPINE all monies that CALPINE may be compelled to pay in discharging such lien, including all costs and attorney's fees.

31.    DRUGS, ALCOHOL AND WEAPONS

CONTRACTOR agrees to advise its employees and the employees of its subcontractors and agents that it is the policy of CALPINE that: (i) The use, possession and/or distribution of illegal or unauthorized drugs, drug-related paraphernalia or weapons on CALPINE's premises is prohibited and the use or possession of alcoholic beverages, except where authorized by CALPINE's management, is also prohibited; and (ii) Any person who is found in violation of the policy may be removed and barred from CALPINE's premises, at the direction of CALPINE.

32.    NON-PUBLICITY

All media releases, public announcements and other disclosures by either Party relating to this Agreement or the subject matter hereof, including promotional or marketing material, but excluding announcements intended solely for internal distribution or to meet legal or regulatory requirements, shall be coordinated with and approved by the other Party prior to release. In addition, the parties shall refrain from removing, overprinting or defacing any notices of copyright, trademark, logo or other proprietary identifications or notices of confidentiality, from any originals or copies of the other Party's Confidential Information. Notwithstanding the foregoing provisions of this Section, CONTRACTOR may list CALPINE as a customer of CONTRACTOR.

33.    ENTIRE AGREEMENT

This Agreement contains the entire agreement of the parties relating to the subject matter hereof. The provisions of this Agreement shall be enforceable notwithstanding the existence of any claim or cause of action of CONTRACTOR against CALPINE whether predicated on this Agreement or otherwise.

IN WITNESS WHEREOF, this Agreement is executed effective as of the day and year first above written.

CALPINE

Calpine Eastern Corporation

By: _____

Title: _____Vice  President_____

Date: _____10/18/2005_____

CONTRACTOR

AP & M Field Services, Inc.

By: _____

Title: General Operations Manager _____

Date: ____10/17/05____

## CERTIFICATE OF SERVICE

I, Scott Haworth, hereby certify and affirm that a true and correct copy of the attached **Civil Cover Sheet, Notice of Motion, Affidavit of Scott L. Haworth, Memorandum of Law in Support of Defendant AP&M's Motion to Withdraw the Reference and Proposed Order** was served via Federal Express Overnight Mail on this 8th day of November, 2007, upon the following:

Richard M. Cieri (RC 6062)
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
**FedEx Tracking No.: 7926 9492 2544**

SCOTT L. HAWORTH (SLH-5890)

Dated: New York, New York
November 8, 2007

NOTICE OF ENTRY

Sir:—Please take notice that the within is a (*certified*) true copy of a duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.,

SEDGWICK, DETERT, MORAN & ARNOLD LLP
*Attorney(s) for* Defendant

*Offices and Post Office Address*
125 BROAD STREET
NEW YORK, N.Y. 10004

To

Attorney's for

NOTICE OF SETTLEMENT

Sir:—Please take notice that an order of which the within is a true copy will be presented for settlement to the Hon. one of the judges of the within named Court, at on at

Dated,

Yours, etc.,

SEDGWICK, DETERT, MORAN & ARNOLD LLP
*Attorney(s) for* Defendant

*Offices and Post Office Address*
125 BROAD STREET
NEW YORK, N.Y. 10004

To

Attorney(s) for

NY/513757v1

---

Case No.: 05-60200 (BRL) (Jointly Administered)

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In Re

CALPINE CORPORATION, et al.,

Debtors.

CALPINE EASTERN CORPORATION,

Plaintiff,

- against -

AP&M FIELD SERVICES, INC.,

Defendant.

**CIVIL COVER SHEET, NOTICE OF MOTION, AFFIDAVIT OF SCOTT L. HAWORTH, MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AP&M'S MOTION TO WITHDRAW THE REFERENCE AND PROPOSED ORDER**

SEDGWICK, DETERT, MORAN & ARNOLD LLP
*Attorney(s) for* Defendant AP&M FIELD SERVICES, INC.

*Offices and Post Office Address*
125 BROAD STREET
NEW YORK, N.Y. 10004
Tel (212) 422-0202

To

Attorney(s) for Plaintiff

Service of a copy of the within

Dated,

is hereby admitted.

Attorney(s) for