UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
CALPINE CORPORATION                                 :
                                                    :
                    Plaintiff,                      :
                                                    :        07 Civ. 9911 (GEL)
         -against-                                  :
                                                    :        **OPINION AND ORDER**
AP&M FIELD SERVICES, INC.,                           :
                                                    :
                    Defendant.                      :
                                                    :
-------------------------------------------------------------x

Matthew Solum, Carl D. LeSueur (of Counsel),
Kirkland & Ellis LLP, New York, New York,
for plaintiff.

Scott L. Haworth, Barry L. Gerstman (of Counsel),
Sedgwick, Detert, Moran & Arnold LLP, New York,
New York, for defendant.

GERARD E. LYNCH, District Judge:

        This case arises from the catastrophic failure of one of two turbine engines used by

plaintiff Calpine Corporation ("Calpine") to deliver power to New York's John F. Kennedy

International Airport.  Plaintiff blames defendant AP&M Field Services, Inc. ("AP&M") for the

failure, claiming that employees of AP&M, which had contracted to perform maintenance on the

turbine, negligently failed to tighten a locknut on a leverarm within the turbine, leading the nut

to come loose, the leverarm to fly off, and serious damage to the turbine to result, ultimately

causing the turbine to fail.  AP&M moves to dismiss the suit, or for other sanctions, on the

ground that Calpine failed to preserve vital evidence relevant to the action, by repairing the

engine and discarding the various damaged parts without according AP&M an adequate

opportunity to have its expert consultants perform a full failure analysis to determine the cause

of the catastrophe.  The motion will be denied.

## BACKGROUND

The facts giving rise to this dispute are largely uncontested.  Calpine's turbine failed on June 3, 2006, just over two months after AP&M employees had last performed maintenance on the turbine on March 23-25, 2006.  (Haworth Decl. ¶ 9; O'Brien Decl. ¶¶ 5, 8.)  Although a second turbine remained operational, it is undisputed that the reliable supply of power to the airport and the New York City power grid required the turbine to be repaired and put back into service expeditiously.  (O'Brien Decl. ¶ 17.)  Calpine immediately advised AP&M that the turbine had failed and needed to be repaired as soon as practicable, alleging that the failure was due to a locknut and leverarm that had come loose and caused extensive damage to other parts of the engine, and asserting that in Calpine's view, AP&M was responsible for the failure.  (O'Brien Decl. ¶¶ 9-16.)  Calpine invited AP&M to inspect the damaged turbine, and demanded that it perform the necessary repairs.  (O'Brien Decl. ¶¶ 9, 12, 17.)  On June 5 and 6, Calpine sent AP&M photographs of the locknut and leverarm, in support of its assertion that the locknut had come loose because it had not been properly tightened.  (O'Brien Decl. ¶¶ 13-14.)  At different times during the pendency of this action, in support of various arguments about discovery, both sides have acknowledged that within a few days of the accident, both Calpine and AP&M understood that Calpine believed AP&M was responsible for the accident, and that litigation was a distinct possibility.  Indeed, both sides involved lawyers in their decisionmaking process at about this time.

On June 8, 2006, two AP&M employees arrived to examine the turbine, apparently for the purpose of deciding what repairs would be necessary and whether and on what terms AP&M

2

should undertake to perform the repairs.  (Haworth Decl. ¶ 10; O'Brien Decl. ¶ 17.)  Though the parties dispute exactly what the AP&M representatives did or were permitted to do, it is not seriously disputed that they had an opportunity to examine the locknut and leverarm, and that they performed a sufficient inspection to understand at least in a general way the extent of the repairs that would be required.  Calpine does not, however, appear to dispute AP&M's assertion that its personnel were not able to perform a full analysis of the cause of the accident, which would have required the disassembly of the engine, something that could not practicably be done on Calpine's premises due to the lack of necessary equipment.  (Haworth Decl. ¶ 10; Haworth Reply Aff. ¶¶ 12-13.)

The very next day, June 9, AP&M notified Calpine that it would not undertake the repair, and Calpine responded that General Electric, the manufacturer of the engine, would be retained to perform the necessary repairs.  (O'Brien Decl. ¶¶ 23-24, 27.)  On June 19, Calpine retained an expert to perform a forensic examination of the turbine, in order to assess the cause of the accident.  (Haworth Decl. ¶ 5 & Ex. D.)  Calpine wrote a claim letter to AP&M on June 30, repeating that the repairs were being performed, and formally notifying AP&M that it intended to file a claim.  (Haworth Decl. ¶ 5 & Ex. E.)  Calpine did not advise AP&M that it intended to have an expert examine the engine for litigation purposes.

While the engine was being disassembled for repair, Calpine's expert performed his examination of the turbine, concluding that, as Calpine had hypothesized, the accident was caused by the loose locknut.  (Haworth Decl. ¶¶ 12-13 & Ex. F.)  It is undisputed that during this period, Calpine did not offer to AP&M, nor did AP&M request, an opportunity to be present at any expert testing of the engine.  AP&M first requested an opportunity to perform its own expert

3

examination on September 21, 2006.  (Haworth Decl. ¶ 14.)  By that time, the turbine had been

repaired and was back in operation, and Calpine had discarded the damaged parts.  (O'Brien

Decl. ¶¶ 29, 31.)  While AP&M has available to it discovery materials such as the daily status

reports for the turbine while it was in operation before and after AP&M's March 2006 repair

(O'Brien Decl. ¶ 34), photographs of the damaged turbine and its parts (Id. ¶ 30), and Calpine's

expert report, as well as whatever information AP&M's own personnel were able to glean during

their June 8 inspection of the turbine, Calpine does not seriously dispute the contention of

AP&M's expert that it is not possible for an expert to perform a failure analysis comparable to

that completed by Calpine's expert using the materials now available to AP&M.  (See Moore

Aff. ¶¶ 5, 10.)

Accordingly, AP&M argues that Calpine's failure to involve it in the testing and repair

process, and its disposal of the damaged turbine parts, constitute spoliation of evidence entitling

AP&M to sanctions including dismissal of the action, or failing that, preclusion of evidence or

an adverse inference instruction.

## DISCUSSION

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999).  Once spoliation has

been proven, the determination of an appropriate sanction is within the sound discretion of the

trial court.  See Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999)

("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide

discretion in sanctioning a party for discovery abuses, and for the spoliation of evidence.")

4

(citations omitted).  However, the sanction chosen should be crafted "to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  West, 167 F.3d at 779.

"It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."  Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998).  "This [adverse inference] sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation."  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001).  Where there is evidence of "willfulness, bad faith, or fault on the part of the sanctioned party," dismissal may also be an appropriate sanction for spoliation.  West, 167 F.3d at 779.  As the Second Circuit has made clear, however, "because dismissal is a 'drastic remedy,' it 'should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'"  Id., quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988).

The record before the Court makes clear that while both parties to this action were aware that litigation was contemplated, and had involved attorneys, insurance adjusters, and experts in their deliberations, neither party behaved as might ideally have been expected.  On the one hand, although Calpine had notified AP&M of its intention to file a claim against it, and had retained its own expert to perform a thorough analysis of the turbine – something that Calpine clearly understood could only be performed while the engine was being disassembled for the repair

5

process at GE's facility – Calpine never advised AP&M that it was undertaking such a study, or offered AP&M the opportunity to have its own expert present for the study.  Such an offer would have been consistent with the best practices, and should be expected of a party that was planning litigation and wanted to make sure all parties had a fair opportunity to understand the true cause of the engine failure.  It is no sufficient answer to maintain that AP&M's representatives had an opportunity to examine the turbine on June 8, 2006.  Whatever they did or did not have the opportunity to do or observe on that day, it is essentially undisputed that a full failure analysis was not possible under the conditions and within the time limitations of that inspection, and that Calpine's own expert, with its full knowledge, undertook a much more comprehensive examination after the engine was disassembled for repair.  While Calpine emphasizes, correctly, that the necessity for prompt repairs precluded maintaining the engine in its damaged state indefinitely pending litigation, that necessity explains neither the failure to invite AP&M to be present for its expert examination of the disassembled turbine during the repair process, nor its failure to retain the various replaced and damaged parts after the repairs were completed.

On the other hand, despite its knowledge that the repairs were in progress, that Calpine needed to complete the repairs expeditiously, and that the repair period – when the engine was disassembled in a facility that was fully equipped to permit such repair and inspection – was the ideal time to perform a failure analysis, AP&M, which was equally aware of the impending litigation, and was fully aware of the limitations of its own inspection, did not seek an opportunity for a more complete testing of the engine until some three and a half months after the failure – well after the necessary repairs had been completed.  Just as it is unlikely that Calpine was unaware that AP&M would reasonably want to perform such an analysis, it is

inconceivable that AP&M did not expect that Calpine – which had already indicated its intention to make a claim against AP&M – would not engage an expert to examine the turbine.  It is somewhat disingenuous of AP&M to blame Calpine for failing to notify it that an inspection would be performed, when it did not for its own part timely demand the opportunity to inspect the turbine fully, to be present for any testing performed by Calpine, or at least to examine any defective or damaged parts.  A party cannot sleep on its rights while an adversary predictably conducts its own expert examinations in diligent preparation for litigation, and then complain that it was not invited to participate.

Under these circumstances, the drastic sanction of dismissal – or preclusion of Calpine's evidence of causation, which would amount to the same thing – is manifestly inappropriate.  This is not a case in which Calpine learned of an accident, and then repaired the damage, discarded the evidence in the dead of night, and only then advised AP&M that it was blaming AP&M for the disaster.  Rather, Calpine immediately notified AP&M of the incident, invited AP&M to inspect the turbine, and offered AP&M the opportunity to perform the repairs (which would have given AP&M a full opportunity to perform a causation analysis) itself.  Although AP&M appears to be correct, as noted above, that this inspection may not in itself have been adequate to give it a fair opportunity to defend the resulting lawsuit, at a minimum it put AP&M on full notice of the nature of the damages, and of what would be necessary for it to contest Calpine's already-asserted claim that AP&M's faulty maintenance was responsible for the accident.  AP&M thus had ample opportunity to protect itself by insisting on having its own personnel or expert consultants on hand during the repairs it knew GE would be making, or the testing it had every reason to anticipate Calpine would conduct.

Both sides in this case are entitled to a fair opportunity to have a fact-finder determine, as best it can, who bears responsibility for this accident.  The spoliation doctrine exists to prevent one side from denying such an opportunity to the other by destroying or altering material evidence.  It does not, however, permit a party to avoid the contest by defaulting the other side through playing a game of "gotcha" instead of seeking to develop its own case in a timely and appropriate manner.

The proper place for these issues to be resolved, if the parties cannot arrive at an agreement, is before a jury.  If AP&M is unable to directly controvert the findings of Calpine's expert, it will certainly be open to AP&M to argue to the jury that the reason it cannot do so is because Calpine's actions somehow prevented it from engaging in its own expert analysis (if it can develop a persuasive explanation of its own failure to timely seek an opportunity to do so).  AP&M can certainly bring to the jury's attention Calpine's failure to preserve the damaged parts that might have permitted AP&M's expert, and the jury itself, to examine the damage and draw their own conclusions.  Calpine, in turn, can point out AP&M's failure to demand such preservation, and argue that AP&M is attempting to divert attention away from the events leading up to the accident and towards litigation decisions made long after the fact.  The jury will be permitted to draw whatever inferences it thinks reasonable from the actions of the parties.

Calpine has essentially opened the door to adverse jury fact-finding, which it could easily have prevented by a more cautious and responsible course of action, including inviting AP&M to be present for expert testing and retaining the damaged parts after repairs were completed.  AP&M is entitled to put these matters to the jury, if it deems such a course to be tactically wise.  But AP&M is not entitled, on these facts, to have the Court put its thumb on the scales by

8

directing the jury to draw one conclusion rather than another.

## CONCLUSION

Accordingly, for the reasons set forth above, the motion for sanctions for alleged

spoliation of evidence is denied.

SO ORDERED.

Dated: New York, New York
December 9, 2008

GERARD E. LYNCH
United States District Judge

9